IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 7 |
| | : | |
| ATLANTA LIGHT BULBS, INC. | : | CASE NO. 22-52950-pMb |
| | : | |
| Debtor. | : | JUDGE BAISIER |
| _____ | : | |
| | : | |
| SUN COURT PARTNERS, LP | : | |
| | : | |
| Movant, | : | |
| | : | |
| v. | : | CONTESTED MATTER |
| | : | |
| ATLANTA LIGHT BULBS, INC., | : | |
| | : | |
| Respondent. | : | |
| _____ | : | |

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** that **SUN COURT PARTNERS, LP** has filed its Motion for Relief From Stay Pursuant to 11 U.S.C. § 362, for Rejection of Lease *Nunc Pro Tunc* and for Abandonment of Any Property in the Leased Premises (the "**Motion**") and related papers with the Court seeking an order granting relief from the automatic stay so that it may take possession of the leased premises and/or institute eviction proceedings against the Debtor, that the lease be rejected, that any property remaining in the premises be deemed abandoned and that the automatic stay, presently in effect, shall be modified.

**PLEASE TAKE FURTHER NOTICE** that the Court will hold an initial telephonic hearing for announcements on said Motion for Relief from Stay at the following number: 1-833-568-8864; meeting id 161 706 9079 in Courtroom 1202, United States Courthouse, 75 Ted Turner Drive, S.W., Atlanta, Georgia at **1:00 p.m**. on **June 13, 2022**.

Matters that need to be heard further by the Court may be heard by telephone, by video conference, or in person, either on the date set forth above or on some other day, all as determined by the Court in connection with this initial telephonic hearing. Please review the "Hearing Information" tab on the judge's webpage, which can be found under the "Dial-in and Virtual Bankruptcy Hearing Information" link at the top of the webpage for this Court, www.ganb.uscourts.gov for more information.

Your rights may be affected by the Court's ruling on these pleadings. You should read these pleadings carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.) If you do not want the Court to grant the relief sought in these pleadings or if you want the Court to consider your views, then you and/or your attorney must attend the hearing.  You may also file a written response to the pleading with the Clerk at the address stated below, but you are not required to do so.  If you file a written response, you must attach a certificate stating when, how and on whom (including addresses) you served the response. Mail or deliver your response so that it is received by the Clerk at least two business days before the hearing.  The address of the Clerk's Office is: Clerk, U. S. Bankruptcy Court, Suite 1340, 75 Ted Turner Drive, Atlanta Georgia 30303.  You must also mail a copy of your response to the undersigned at the address stated below.

If a hearing on the motion for relief from the automatic stay cannot be held within thirty (30) days, Movant waives the requirement for holding a preliminary hearing within thirty days of

filing the motion and agrees to a hearing on the earliest possible date. Movant consents to the

automatic stay remaining in effect until the Court orders otherwise.

Dated:  May 26, 2022.                         /s/   *Kristen Yadlosky*
                                              Todd H. Surden
                                              Georgia Bar No. 774046
                                              Kristen Yadlosky
                                              Georgia Bar No. 779615
                                              Hartman Simons & Wood LLP
                                              400 Interstate North Parkway, SE
                                              Suite 600
                                              Atlanta, Georgia 30339
                                              (770) 955-3555
                                              todd.surden@hartmansimons.com
                                              kristen.yadlosky@hartmansimons.com
                                              Counsel for SUN COURT PARTNERS, LP

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 7 |
| | : | |
| ATLANTA LIGHT BULBS, INC. | : | CASE NO. 22-52950-pMb |
| | : | |
| Debtor. | : | JUDGE BAISIER |
| | : | |
| | : | |
| SUN COURT PARTNERS, LP | : | |
| | : | |
| Movant, | : | |
| | : | |
| v. | : | CONTESTED MATTER |
| | : | |
| ATLANTA LIGHT BULBS, INC., | : | |
| | : | |
| Respondent. | : | |
| | : | |

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY, FOR REJECTION OF THE LEASE *NUNC PRO TUNC* AND FOR ABANDONMENT OF ANY PROPERTY IN THE PREMISES

COMES NOW Sun Court Partners, LP ("**Movant**" or "**Landlord**"), by and through its undersigned attorneys, and respectfully moves this Court for relief from the automatic stay pursuant to 11 U.S.C. §§ 362, 365 and 554 and Bankruptcy Rules 4001, 9013 and 9014 by filing this Motion for Relief from the Automatic Stay to take possession of leased premises, for rejection of a commercial lease and for abandonment of any property in leased premises (the "**Motion**"), showing the Court as follows:

1.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and 11 U.S.C. §§ 362, 365 and 554.

2.

On or about September 30, 2020, Plaintiff, as landlord, and Debtor Atlanta Lights Bulbs, Inc. ("**Tenant**" or "**Debtor**"), as tenant, entered into an unexpired, nonresidential, commercial Office Lease (the "**Lease**"), for the premises located at Suite 460, 2 Sun Court, Peachtree Corners, Gwinnett County, Georgia 30092 (the "**Premises**"), consisting of approximately 7,685 square feet.   A true and correct copy of the Lease is attached hereto as Exhibit "1" and incorporated herein by reference.

3.

Pursuant to the Declaration of Commencement Date executed by Landlord and Tenant pursuant to Section 1.4 of the Lease, the Lease Commencement Date was January 1, 2021, and the Lease Expiration Date is to be July 31, 2028 (the "Term").

4.

Tenant ceased operating from the Premises, directed its employees to operate from another location, and removed all furniture, fixtures and equipment from the Premises. Accordingly, the Lease and the Premises are not necessary to a Chapter 11 reorganization because Tenant abandoned the Premises and stopped paying rent and other charges due under the Lease.

5.

The rent and other charges due under the Lease is not below market, and there is no value to the Debtor's Estate or the creditors to be obtained from assumption of the Lease.

6.

This is a motion seeking relief from the automatic stay under section 362 of the Bankruptcy Code for the purposes of allowing Movant to proceed with its state law remedies with respect to the Premises, including without limitation evicting Debtor from the Premises.

7.

On April 15, 2022 (the "**Petition Date**"), an involuntary petition for relief under Chapter 11 of the United States Bankruptcy Code ("**Bankruptcy Code**") was filed against Debtor. Debtor has not appeared in the case or otherwise responded to the involuntary petition.

8.

No rent or other amounts and charges due under the Lease have been paid since before the Petition Date.

9.

Movant is presently unable to take possession of the Premises and otherwise enforce its contractual and statutory rights, unless the Court terminates, annuls, modifies or otherwise alters the automatic stay under 11 U.S.C. § 362.

10.

Movant is entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) "for cause," as well as under 11 U.S.C. § 362(d)(2) for debtor's lack of equity in or value to the creditors from the Lease or the Premises, in order to take possession of the Premises and/or to evict the Debtor from the Premises pursuant to O.C.G.A. § 44-7-49 et seq. and the Lease.

11.

Movant further requests that the Order for stay relief not be stayed during the fourteen (14)-day period under Bankruptcy Rule 4001(a)(3) and the Order become effective immediately upon entry.

## ARGUMENT AND CITATION OF AUTHORITY

12.

Under § 362(d)(2) of the Bankruptcy Code, the Court may grant relief from the automatic stay if "the debtor does not have any equity in such property and such property is not necessary

to an effective reorganization."  Debtor has abandoned the Premises and has not paid rent and other amounts due under the Lease.  Moreover, the Lease has no value to the Estate and has no potential to benefit the creditors.

13.

In addition, under the Bankruptcy Code, a landlord is not forced to extend credit to a debtor/tenant by allowing the debtor/tenant to maintain possession without paying post-petition rent.  *In re Sportsman's Warehouse, Inc*., 436 B.R. 308 (Bankr. Del. 2009) (stating that "the mere fact that the Debtors are occupying the Landlord's premises is sufficient, in and of itself, to establish that payment for that use and occupancy is an actual, necessary expense of preserving the Debtors' estates under Section 503(b)(1)."), quoting *In re Goody's Family Clothing*, 392 B.R. 604 (Bankr. Del. 2008), aff'd., 401 B.R. 656 (D. Del. 2009); *In re DVI, Inc*., 308 B.R. 703 (Bankr. Del. 2004).

14.

Under § 362(d)(1) of the Bankruptcy Code, the Court may grant relief from the automatic stay "for cause."  "Cause" for relief from the stay is viewed as a broad and flexible concept." *See In re M.J. & K. Co.*, 161 B.R. 586, 590 (Bankr. S.D.N.Y. 1993).

15.

Section 362(d)(1) expressly includes the "lack of adequate protection of an interest in property" as cause for relief from the stay.

16.

Here, there exists overwhelming cause to grant the requested relief from stay to allow Movant to proceed with its state law remedies with respect to the Premises, including without limitation evicting Debtor from the Premises.

17.

Tenant is substantially in arrears on the rent and other amounts owed under the Lease since before the Petition Date.

18.

These defaults and failure to pay rent by Tenant demonstrate that Debtor has failed to provide adequate protection under Section 362.  Relief from stay should be granted due to the complete absence of adequate protection of Movant's interest in the Lease and Premises alone. 11 U.S.C. § 362(d)(1) ("for cause, including the lack of adequate protection of an interest in property of such party in interest"); *In re Gold Rush, II, Inc.*, 2005 Bankr. LEXIS 2757 (N.D. Ga. 2005) (granting relief from stay and dismissing petition based on debtor's repudiated of pre-petition obligations).

19.

Section 365 of the Bankruptcy Code provides that a debtor or trustee "subject to the Court's approval, may assume or reject an executory contract or unexpired lease."  11 U.S.C. § 365(a).   "This provision allows a trustee to relieve a bankruptcy estate of burdensome agreements which had not been completely performed*." Stewart Title Guaranty Co. v. Old Republic National Title Co.*, 83 F.3d 735, 741 (5th Cir. 1996).

20.

The standard that courts apply to determine whether assumption or rejection of an executory contract or unexpired lease should be authorized is the "business judgment standard." *In re: Gardinier, Inc.*, 831 F.2d 974, 976 (11th Cir. 1987).

21.

The Debtor and the Estate are no longer utilizing the leased premises.  Therefore, the Lease does not appear to have any value to the Estate.  Moreover, it does not appear that the rent

for the Premises is below market, or the Lease has any other assignment value to the Estate.  The recent pandemic and trend to remote work has made it even more unlikely that the Lease would have any value to the Estate.  Finally, the Estate would owe administrative rent to Landlord starting on the Petition Date if the Debtor or Trustee wished to maintain the Lease.  *See Towers v. Chickering & Gregory (In re: Pacific-Atlantic Trading Co.)*, 27 F.3d 401, 404 (9th Cir. 1994) (finding that a debtor's responsibilities under Section 365(d)(3) are mandatory and require that the debtor timely perform all of its rental obligations under a lease).

22.

In the interest of expediting the rejection of the Lease and making it a clear benefit to the Estate, Landlord proposes through this Motion to make the rejection effective *nunc pro tunc* to the Petition Date so as to allow the Bankruptcy Estate to avoid any obligation for administrative rent.

23.

To the extent that the Debtor left any property including but not limited to personal property, furniture, fixture and/or equipment (collectively, "**Property**"), at the Premises, Landlord requests that the Property be abandoned pursuant to 11 U.S.C. § 554 of the Bankruptcy Code.

24.

Section 554(a) of the Bankruptcy Code provides that "[a]fter notice and a hearing, the Trustee may abandon any property of the Bankruptcy Estate that is burdensome to the Estate or that is of inconsequential value and benefit to the Estate."  11 U.S.C. § 554(a).

25.

Upon information and belief, Debtor removed its property from and abandoned the Premises.  Nevertheless, Landlord requests that any remaining Property be deemed abandoned pursuant to 11 U.S.C. § 554 of the Bankruptcy Code.

26.

Based upon the foregoing facts and circumstances, Landlord submits that the abandonment of Property remaining in the Premises in the manner set forth above is supported by sound business judgment and is necessary, prudent and in the best business interests of the Debtor, the Estate, creditors and parties in interest

**WHEREFORE**, Movant requests this Court enter an Order granting the following relief:

(a)     That the Court lift the automatic stay to allow Movant to exercise its state-law rights and remedies in and with respect to the Premises and any Property remaining in the Premises, including without limitation taking all necessary steps to evict Debtor from the Premises;

(b)     That the Lease be deemed rejected;

(c)     That any Property remaining in the Leased Premises be deemed abandoned;

(d)     That this Order be enforceable immediately upon entry by the Court, notwithstanding the requirement of Bankruptcy Rule 4001(a)(3); and

(e)     That the Court grant such other relief as is just and proper.

Dated:  May 26, 2022.

/s/   *Kristen Yadlosky*
Todd H. Surden
Georgia Bar No. 774046
Kristen Yadlosky
Georgia Bar No. 779615
Hartman Simons & Wood LLP
400 Interstate North Parkway, SE, Suite 600
Atlanta, Georgia 30339
(770) 955-3555
todd.surden@hartmansimons.com
kristen.yadlosky@hartmansimons.com
Counsel for Sun Court Partners, LP

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 26th day of May, 2022, she caused a true and correct copy of the foregoing document to be served electronically on the parties registered to receive ECF notification from the Court, and that she served the foregoing document by depositing a copy of same in the United States mail in an envelope properly addressed to the following, with adequate postage thereon to ensure proper delivery on the following:

| | | |
|---|---|---|
| *Debtor* | represented by | **Atlanta Light Bulbs, Inc.** |
| **Atlanta Light Bulbs, Inc.** | | **PRO SE** |
| 2109 Mountain Industrial Blvd. | | |
| Tucker, GA  30084 | | |
| | | |
| *Petition Creditor* | represented by | **John C. Cannizzaro** |
| **Halco Lighting Technologies, LLC** | | Ice Miller LLP |
| 2940 Pacific Drive | | 250 West Street, Suite 700 |
| Norcross, GA  30071 | | Columbus, OH  43215 |
| | | John.cannizzaro@icemiller.com |
| | | |
| | | **Kathleen G. Furr** |
| | | Baker Donelson |
| | | 3414 Peachtree Road, NE |
| | | Suite 1500, Monarch Plaza |
| | | Atlanta, GA  30326 |
| | | kfurr@bakerdonelson.com |
| | | |
| | | **Jason M. Torf** |
| | | Ice Miller LLP |
| | | 200 W. Madison Street |
| | | Suite 3500 |
| | | Chicago, IL  60606 |
| | | Jason.Torf@icemiller.com |
| | | |
| *Petition Creditor* | represented by | **John C. Cannizzaro** |
| **Candela Corporation** | | (see address above) |
| 5600 Argosy Ave., Suite 300 | | |
| Huntington Beach, CA  92649 | | **Kathleen G. Furr** |
| | | (see address above) |
| | | |
| | | **Jason M. Torf** |
| | | (see address above) |

| | | |
|---|---|---|
| *Petition Creditor*<br>**Norcross Electric Supply Company**<br>4190 Capital View Drive<br>Suwanee, GA  30024 | represented by | **John C. Cannizzaro**<br>(see address above)<br><br>**Kathleen G. Furr**<br>(see address above)<br><br>**Jason M. Torf**<br>(see address above) |
| *U.S. Trustee*<br>**United States Trustee**<br>362 Richard Russell Federal Building<br>75 Ted Turner Drive, SW<br>Atlanta, GA  30303 | represented by | **Thomas Dworschak**<br>Office of the U.S. Trustee<br>Room 362<br>75 Ted Turner Drive, SW<br>Atlanta, GA  30303<br>Thomas.w.dworschak@usdoj.gov |

/s/  *Kristen A. Yadlosky*
Kristen A. Yadlosky

# **EXHIBIT 1**

## LEASE

In consideration of the rents and covenants hereinafter set forth, Landlord leases to Tenant and Tenant rents from Landlord the following described Premises upon the following terms and conditions of this Lease (this "Lease"):

1.    LEASE PROVISIONS.

        1.1    EFFECTIVE DATE:  September 30    , 2020

        1.2    PARTIES AND NOTICE ADDRESSES:

                Landlord:    SUN COURT PARTNERS, LP,
                                 a Florida limited partnership
                                 6101 Carnegie Blvd.
                                 Suite 455
                                 Charlotte, NC 28209

                Tenant:    ATLANTA LIGHT BULBS, INC.,
                                 a Georgia corporation
                                 2109 Mountain Industrial Blvd.
                                 Tucker, GA 30084

        1.3    PREMISES:  Landlord leases to Tenant and Tenant leases from Landlord certain premises located in the building located at 2 Sun Court, Peachtree Corners, Georgia 30092 and commonly known as 2 Sun (the "Building"), which premises are known as Suite 460 located on the fourth (4th) floor of the Building (the "Premises"). For purposes of this Lease, the terms "rentable square feet" or "rentable area" and "usable area" shall be calculated substantially in accordance with the Standard Method for Measuring Floor Area in Office Buildings, ANSI/BOMA Z65.1-2017.  The rentable area of the Premises is estimated for all purposes hereof to be 7,685 square feet as of the Effective Date.  Following the completion of the Tenant Improvements as set forth Exhibit B, Landlord shall determine the rentable area of the Premises substantially in accordance with the Standard Method for Measuring Floor Area in Office Buildings, ANSI/BOMA Z65.1-2017. If it is determined by such measurement that the Premises contains rentable area different than the amount set forth above, then the Rent, Tenant's Proportionate Share, and all other provisions of this Lease based on the amount of rentable area leased by Tenant shall be adjusted. The rentable area shall be set forth on the Declaration of Commencement Date attached as Exhibit C in accordance with Section 1.4 below.  The Premises are depicted on Exhibit A attached hereto.

        1.4    TERM:  The term of this Lease (the "Term") shall be for a period of ninety-one (91) months, commencing on January 1, 2021 (the "Commencement Date"), and ending on July 31, 2028, unless earlier terminated or extended as hereafter provided. In the event Landlord is unable to deliver possession of the Premises on the Delivery Date (as defined in Exhibit B), Landlord shall not be liable for any damage caused thereby, nor shall this Lease be void or voidable.  Prior to occupancy, including the beneficial occupancy as stipulated below, Tenant shall submit to Landlord the required certificate of insurance as required under Section 4.1 hereof simultaneously with the execution of this Lease.  Landlord shall promptly after the Commencement

Date prepare a declaration (substantially in the form of <u>Exhibit C</u> attached hereto) confirming the Commencement Date and the other information set forth thereon. Tenant shall execute and return such declaration within ten (10) business days after submission. If Tenant fails to execute and return such declaration to Landlord within said ten (10) business day period, Tenant shall be conclusively deemed to have agreed that the information in the declaration is accurate and Tenant shall have thereby waived any right to object to the accuracy of such information unless Landlord has, during said ten (10) business day period, received a written notice from Tenant objecting to such information and describing in detail Tenant's reasons for so objecting.

Notwithstanding the foregoing to the contrary, if the Tenant Improvements are complete and a certificate of occupancy has been issued for the Premises by the appropriate governing body prior to the Commencement Date, Tenant shall, during the period commencing on the date of issuance of such certificate of occupancy and running through December 31, 2020 (the "<u>Beneficial Occupancy Period</u>"), be permitted to use and occupy the Premises pursuant to all the terms and provisions of this Lease, including, without limitation, maintaining insurance policies for the Premises upon the same terms, amounts and types of insurance as provided in this Lease as evidenced by delivery of a certificate of insurance to Landlord prior to the commencement of the Beneficial Occupancy Period, except that Tenant shall not be required to pay base rent or Tenant's Proportionate Share of Operating Expenses during such Beneficial Occupancy Period; provided, however, Tenant shall pay for the cost of any other Building services requested by Tenant (e.g., overtime HVAC, etc.) during the Beneficial Occupancy Period.

1.5    <u>BASE RENT AMOUNT AND PAYMENT:</u> Tenant shall pay to Landlord as rent, in advance, without deduction, set-off, prior notice or demand, the base rent amounts as set forth below, commencing on the Commencement Date, subject to the "Free Rent Period" shown and defined below, and continuing on the first day of each and every month thereafter throughout the Term of this Lease, payable in lawful money of the United States of America. The base rent shall be paid at such address(es), place or places and in such manner as Landlord may from time to time direct. Monthly base rent for any partial month shall be pro rated at the rate of 1/30th of monthly rental per day. If any installments of base rent are not paid by the tenth (10th) day of the month in which they are due and such failure continues for five (5) days subsequent to the date of receipt by Tenant of written notice of non-payment from Landlord (provided, however, that Landlord shall not be obligated to provide such notice and cure period more than one (1) time during the Term, after which no further notice with respect to any such non-payment shall be required in order for Landlord to assess Tenant as provided hereunder), then such sums shall bear interest at the then current Bank of America, N.A. prime rate (or such other bank as Landlord may elect), plus two percent (2%) from due date until paid in full. In the event the Commencement Date is other than the first day of a calendar month, then the base rent for that partial month shall be prorated based on the initial monthly base rent and the partial month shall be added to the Term of the Lease, so that (1) rent adjustment dates occur on the first day of a calendar month and (2) the expiration date is the last day of a calendar month. Base rent shall be payable as follows:

| Months | Base Rent Per Square Foot |
|---|---|
| 01/01/21 – 12/31/22 | $21.50 |
| 01/01/23 – 12/31/23 | $22.04 |

2

| | |
|---|---|
| 01/01/24 – 12/31/24 | $22.59 |
| 01/01/25 – 12/31/25 | $23.15 |
| 01/01/26 – 12/31/26 | $23.73 |
| 01/01/27 – 12/31/27 | $24.32 |
| 01/01/28 – 07/31/28 | $24.93 |

Notwithstanding anything in this Lease to the contrary, Tenant shall be entitled to an abatement of base rent (the "Free Rent") during the first twenty-four (24) months of the Term (the "Free Rent Period"), commencing on the Commencement Date, as follows: (i) during the first seven (7) months of the Term, base rent shall be fully (100%) abated each month, and (ii) during the subsequent seventeen (17) months of the Term, base rent shall be abated each month in an amount equal to (A) (1) the total rentable area of the Premises *minus* 6,000, *times* (2) $21.50, *divided by* (B) twelve (12), such that Tenant pays base rent on 6,000 rentable square feet only. By way of example only, if the Premises contains 7,685 rentable square feet, then the abatement in clause (ii) above shall be in the amount of $3,018.96 per month, which calculated as follows: (A) (1) 7,685 *minus* 6,000 (= 1,685), *times* (2) $21.50 (= $36,227.50), *divided by* (B) twelve (12) (= $3,018.96). In the event of a monetary Event of Default by Tenant under this Lease during the Term, the unamortized portion of such Free Rent shall be revoked, null and void and shall become immediately due and payable. During the Free Rent Period, Tenant shall be responsible for the payment of any other charges incurred by Tenant other than base rent. Further, should Tenant be in default (regardless of any notice and cure periods) under the Lease at any time any installment of the Free Rent is otherwise due to be applied, such installment of the Free Rent will not be provided until such time as the default has been cured.

1.6     FIRST MONTH'S PAYMENT: Concurrently with Tenant's execution of this Lease, Tenant has deposited with Landlord the sum of Ten Thousand Seven Hundred Fifty and No/100 Dollars ($10,750.00) for base rent beginning August 1, 2021.

1.7     SECURITY DEPOSIT: Concurrently with Tenant's execution of this Lease, Tenant has deposited with Landlord the sum of Fifteen Thousand Nine Hundred Sixty-Five and 59/100 Dollars ($15,965.59) as a security deposit (the "Deposit"). If Tenant defaults with respect to any provisions of this Lease, including but not limited to the provisions relating to payment of rent or other charges, Landlord may, to the extent reasonably necessary to remedy Tenant's default, use all or any part of the Deposit for the payment of rent or other charges in default or for the payment of any other amount which Landlord may spend or become obligated to spend by reason of Tenant's default or to compensate Landlord for any other loss or damage which Landlord may suffer by reasons of Tenant's default. If any portion of the Deposit is so used or applied, Tenant shall, within ten (10) business days after written demand therefore, deposit cash with Landlord in an amount sufficient to restore the Deposit to the full amount hereinabove stated and shall pay to Landlord such other sums as shall be necessary to reimburse Landlord for any sums paid by Landlord. If Tenant shall fully and faithfully perform every provision of this Lease to be performed by it, the Deposit shall be returned to Tenant within thirty (30) days after the expiration of the Term hereof, unless the Lease is extended pursuant to Section 22 hereof. In the event of termination of Landlord's interest in this Lease, Landlord shall transfer the Deposit to Landlord's successor in interest.

3

      1.8    <u>USE:</u> Tenant shall use and occupy the Premises for general office purposes, not in violation of any protective covenants applicable to the project of which the Building is a part (the "<u>Project</u>"), and for no other purpose without the prior written consent of Landlord. Tenant shall not use or permit the Premises or any part thereof to be used for any purpose other than the purpose expressly authorized herein. Tenant shall have access to the Premises and the Building twenty-four (24) hours per day, seven (7) days per week, subject to Landlord's right to close the Building in the event of an emergency or casualty. Tenant has made a complete inspection of the Premises and shall accept the Premises and the Project in their "AS IS," "WHERE IS," and "WITH ALL FAULTS" condition on the Delivery Date without recourse to Landlord, subject to the terms of <u>Exhibit B</u> attached hereto and hereby made a part hereof. Except as expressly provided in this Lease, Landlord shall have no obligation to furnish, equip or improve the Premises or the Project. The taking of possession of the Premises by Tenant shall be conclusive evidence against Tenant that (i) Tenant accepts the Premises and the Project as being suitable for its intended purpose and in a good and satisfactory condition, (ii) acknowledges that the Premises and the Project comply fully with Landlord's covenants and obligations under this Lease and (iii) waives any defects in the Premises and its appurtenances and in all other parts of the Project. Tenant shall be solely responsible, at its sole cost and expense, for complying with all laws applicable to the use, occupancy and condition of the Premises (including, without limitation, those which may require Tenant to temporarily cease operations and/or reduce its use of the Premises) except to the extent such laws apply to Landlord's construction obligations or other obligations pursuant to this Lease.

      1.9    <u>TELEPHONE; CABLE</u>. Tenant shall contract directly and pay, prior to delinquency, for all telephone and cable services furnished to or used in or about the Premises during the Term of this Lease by Tenant.

    2.    OPERATING EXPENSES

      2.1    <u>INCREASES:</u> In the event that in any calendar year after the Base Year, Landlord's Operating Expenses (as hereinafter defined) of the Building (including the grounds in connection therewith and ancillary parking areas and any other common areas) shall exceed the sum of the Operating Expenses for the calendar year 2022 (the "<u>Base Year</u>"), Tenant shall pay as additional rent and reimburse Landlord for its Proportionate Share (as hereinafter defined) of such increase over and above the Base Year. The Premises are estimated to contain 7,685 rentable square feet, and the Building contains 98,040 rentable square feet. Tenant's "<u>Proportionate Share</u>" is therefore estimated to be Seven and 84/100ths percent (7.84%), subject to adjustment as provided in Section 1.3 above.

      2.2    <u>OPERATING EXPENSES:</u> For purposes hereof, the term "<u>Operating Expenses</u>" shall include all operating expenses of the Building (including the grounds in connection therewith and any and all parking areas and other common areas), including, but not limited to, the following:

         (a)    All real estate taxes and special assessments, and costs to protest or appeal the same. With respect to any assessments which may be levied against or upon the Premises, or which under the laws then in force may be evidenced by improvement or other bonds, or may be paid in annual installments, only the amount of such annual installment (with

appropriate proration for any partial year) and interest due thereon shall be included within the computation of the annual real estate taxes and special assessments levied against the Premises.

(b)    Subject to Section 4.3, insurance costs allocable to the Building, including those insurance costs as set forth in Section 4.2 hereof.

(c)    Wages and salaries of all employees engaged in the operating and maintenance of the Building, including employer's Social Security Taxes and any other taxes which may be levied on such wages and salaries, and also including any other fringe benefits, but excluding income tax liabilities incurred by Landlord out of its Building operations;

(d)    All costs of management, operation, and maintenance of the land, the Building, and other improvements thereon and appurtenances thereto;

(e)    All janitor and office supplies and material used in the operation and maintenance of the Building (excluding those costs billed directly or separately to Tenant or any other tenant of the Building);

(f)    Cost of all maintenance and service agreements, including window cleaning;

(g)    Cost of repairs and general maintenance, exclusive of expense of alterations of Building for the accommodation of a specific tenant;

(h)    The annual amortization over its useful life on a straight-line basis of the costs of any equipment or capital improvements made by Landlord to the Premises, the Building in which the Premises are located or the grounds of said Building which are made for the purpose of reducing operating expenses (or keeping operating expenses from increasing), promoting safety, complying with governmental requirements or maintaining the quality of the Building;

(i)    Cost of all water, sewer, heating, lighting, ventilation, electricity, air conditioning and other utilities supplied or paid for by Landlord for the Building (excluding those costs billed directly or separately to Tenant or any other tenant of the Building), and charges and the cost of operation and maintenance of heating, lighting, ventilating, and air conditioning equipment serving the Building and all tenant space;

(j)    Cost of maintenance and upkeep of the landscaping and grounds of said Building, including, line striping, maintenance and snow and ice control of parking lots, sidewalks and walkways;

(k)    Expenses for security monitoring, patrol service and/or security guard service;

(l)    Costs of alarm permits, required governmental inspections and repairs and maintenance of the fire sprinkler system; and

(m)    Such other operating expenses which Landlord determines relate to the Building, grounds, parking area and other common areas including any maintenance charges for any business park in which the Building is located.

The expenses for "labor" as hereinabove referred to shall include without limitation Workman's Compensation Insurance, Social Security and any fringe benefits paid or accrued to employees of the Building. The term "labor" shall mean all wages allocable to the operation, maintenance or repair of the Building whether the person(s) receiving such wages are employed by Landlord or by a contractor or agent, provided, however, that the salaries paid to executive employees of Landlord shall not be included as Operating Expenses, but salaries and wages of the superintendent of the Building and all employees subject to its direction shall be so included.

In no event will Tenant be required to share in any cost which is reimbursed to Landlord by insurance.

In the event the average occupancy level of the Building for the Base Year and/or any subsequent year was not one hundred percent (100%) or more of full occupancy or if standard services are not provided to the entire Building, then the Operating Expenses for such year shall be adjusted and apportioned among the tenants by the Landlord to reflect those costs which would have occurred had the Building either been one hundred percent (100%) occupied during such year or if standard services had been provided to entire Building. Notwithstanding the preceding sentence, Landlord shall not gross up any Operating Expenses in such a way that Landlord's reimbursements exceed Landlord's actual expenses.

2.3    OPERATING EXPENSE EXCLUSIONS:    Notwithstanding anything contained in the foregoing list, out of pocket expenses for the following shall be excluded from Operating Expenses (unless offset by a corresponding credit):

(a)    costs of repairs or other work occasioned by fire, windstorm or other casualty, to the extent that the costs thereof are reimbursed to Landlord by insurers;

(b)    leasing commissions, attorneys' fees and other expenses incurred in connection with negotiations or disputes with tenants, other occupants, or prospective tenants or other occupants of the Building;

(c)    costs incurred in renovating or otherwise improving or decorating or redecorating space leased to tenants of the Building or other space leased or held for lease in the Building;

(d)    Landlord's costs for electricity and other services (including, without limitation, overtime HVAC costs) sold to tenants for which Landlord is actually reimbursed by tenants, other than through payment of Operating Expenses, as a separate additional charge or rental;

(e)    depreciation and amortization, except as provided in Section 2.2 above;

6

(f)    costs which under generally accepted accounting principles, consistently applied, must be capitalized, except as provided in clause (h) above;

(g)    all amounts paid to subsidiaries or affiliates of Landlord for services on or to the Building, to the extent that the costs of such services demonstrably exceed competitive costs for such services rendered by persons or entities of similar skill, competence and experience;

(h)    payments on any mortgage or deed to secure debt;

(i)    rentals and other related expenses, if any, incurred in leasing air conditioning systems, elevators or other equipment ordinarily considered to be of a capital nature, except equipment which is used in providing janitorial services and which is not affixed to the Building and except as provided above;

(j)    all items and services for which Landlord actually receives reimbursement from Tenant (other than through Tenant paying Tenant's Operating Expenses) or for which Tenant actually pays third parties;

(k)    costs incurred in advertising for the Building or other marketing or promotional activity specifically and primarily designed for marketing space in the Building, but excluding the costs of amenities provided for the benefit of existing tenants of the Building; and

(l)    any bad debt expense or bad debt reserve.

2.4    **PAYMENT:**  Landlord shall from time to time give Tenant notice of Landlord's determination of estimated excess Operating Expenses for the pertinent calendar year. If Landlord makes a redetermination of estimated excess Operating Expenses at a time other than the commencement of a calendar year, then at the time of the next due monthly installment of Tenant's additional rent, such installment shall be increased or reduced, as the case may be, by the monthly difference in Tenant's additional rent resulting from the redetermination, times the number of months elapsed in such year prior to the date on which such next monthly installment of Tenant's additional rent is due.  All such additional rentals based upon the increase (if any) in Operating Expenses over and above the Base Year shall be payable from Tenant to Landlord monthly with each payment of base rent. Operating Expenses for the last year of the Term hereof shall be pro rated as of the expiration of the Term. Tenant's share of such cost shall be determined on an annual basis for each calendar twelve month period ending on December 31st, prorating fractional years. Tenant's share of such annual cost shall be estimated as of the beginning of the Term hereof and at the beginning of each calendar year thereafter and a monthly rate determined, and Tenant shall pay such estimated charge on the first day of each month in advance.  If the monthly payment made by Tenant in such year results in a deficiency, said deficiency shall be paid by Tenant.  If estimated payments result in excess payments by the Tenant, then said excess shall be applied toward subsequent monthly Operating Expense estimates for subsequent monthly payments, which shall be reduced accordingly until the excess is fully exhausted.

3.    PERSONAL PROPERTY TAXES.

Tenant shall pay, prior to delinquency all taxes assessed against and levied upon any trade fixtures, furnishings, equipment and all other personal property of Tenant contained in the

7

Premises, and shall pay all taxes attributable to any leasehold improvements that may be made to the Premises by Tenant. When possible, Tenant shall cause said trade fixtures, furnishings, equipment, personal property and leasehold improvements to be separately assessed. If however, any or all of same shall be assessed and taxed with Landlord's real property, Tenant shall pay to Landlord such taxes as are attributable to Tenant's trade fixtures, furnishings, equipment, personal property, and leasehold improvements within fifteen (15) business days after receipt of an invoice from Landlord advising Tenant of the taxes applicable to Tenant's property.

4. INSURANCE

4.1 TENANT'S INSURANCE: Tenant, shall at all times during the Term hereof, and at its own cost and expense, procure and continue in force commercial general liability and property damage liability insurance, which policies shall name Landlord as an additional insured. Such insurance at all times shall be in an amount of not less than ONE MILLION DOLLARS ($1,000,000) per occurrence combined single limit coverage and TWO MILLION DOLLARS ($2,000,000) in the aggregate. The aforementioned minimum limits of policies shall not, however, limit the liability of Tenant hereunder. Landlord, Landlord's mortgagee and Landlord's property manager shall be named as additional insureds on Tenant's commercial general liability policy. Tenant shall at all times during the Term of this Lease keep and maintain in force and effect its own all-risk insurance coverage protecting it from loss, damage or injury by whatever means, with respect to all improvements, betterments, furniture, fixtures, machinery, equipment, stock in trade and all other items kept, used or maintained by Tenant in, on or about the Premises. Tenant shall also procure and continue in force throughout the Term, worker's compensation insurance as required by law. The aforementioned insurance shall be with companies having a rating of not less than Best's A, VIII rating and which are approved by Landlord. Certificates of such insurance shall be furnished to Landlord by the insurance companies prior to occupancy, and no such policy shall be cancelable or subject to reduction of coverage or other modification except after thirty (30) days prior written notice to Landlord.

4.2 LANDLORD'S INSURANCE: Landlord shall maintain in effect throughout the Term of this Lease, a policy or policies of property insurance, including fire and extended risk coverage subject to standard exclusions, such insurance to be to the extent of at least ninety (90) percent of the full insurable replacement cost of the Building (exclusive of Tenant's improvements and betterments, and furniture, trade fixtures, machinery, and equipment of Tenant), and insurance for Landlord's loss of income for twelve (12) months, and liability insurance on the common areas. The aforementioned insurance shall be with companies having a rating of not less than Best's A rating.

4.3 INCREASE IN FIRE INSURANCE PREMIUMS: Tenant shall comply with all insurance regulations so that the lowest fire and extended coverage, liability and other insurance rates may be obtained and nothing shall be done, or kept in or on the Premises by Tenant which will cause cancellation, invalidation or an unreasonable increase in the premiums of Landlord's insurance. Tenant agrees not to keep, use, sell or offer for sale in or upon the Premises any article or good which may be prohibited by the standard form of fire insurance policy. Tenant agrees to pay upon demand any increase in premium for property insurance that may be charged during the Term of this Lease on the amount of such insurance which may be carried by Landlord on the Premises or the Building resulting from the use of the Premises by Tenant, whether or not

8

Landlord has consented to such use.  Tenant shall be responsible for any increase in property insurance premiums which are attributable in whole or in part to the use of the Premises by Tenant or the activities at or about the Premises by Tenant, its agents, contractors, employees, servants, or sublessees.

      4.4    <u>WAIVER OF RIGHTS</u>:  Landlord and Tenant hereby waive any rights each may have against the other on account of any loss or damage occasioned to the Landlord or the Tenant, as the case may be, or to the Premises or its contents, and which may arise from any risk generally covered by fire and extended coverage insurance.  The parties shall obtain from their respective insurance companies, if possible, insuring the property a waiver of any right of subrogation which said insurance company may have against the Landlord or the Tenant as the case may be.  For purposes of this Section 4.4, the definition of the terms Landlord and Tenant as used herein shall include all agents, representatives, successors, insurers, and assigns of either Tenant or Landlord.

      4.5    <u>TENANT'S PERSONAL PROPERTY</u>:  All of Tenant's personal property at the Premises shall be and remain at Tenant's sole risk, and Landlord shall not be liable for and Tenant hereby releases Landlord from any and all liability or damage thereto, except to the extent arising from the gross negligence or intentional misconduct of Landlord or its agents, employees or contractors.

      5.    DAMAGE OR DESTRUCTION.

      In the event of a fire or other casualty in the Premises, Tenant shall immediately give notice thereof to Landlord.  If the Premises shall be damaged by fire or other casualty so as to render the Premises untenantable in whole or in part, the Rent provided for herein shall abate thereafter as to the portion of the Premises rendered untenantable until the earlier of (a) such time as the Premises are made tenantable as determined by Landlord, or (b) five (5) business days after Landlord substantially completes the restoration of the Premises.  If damage by fire or other casualty results in the Premises being untenantable in whole or in substantial part for a period reasonably estimated by a responsible contractor selected by Landlord to be one (1) year or longer after Landlord's insurance settlement, or in the event of total or substantial damage to the Premises or the Building from any cause and if Landlord shall decide not to rebuild, then in either event, all Rent owed up to the time of such destruction or termination shall be paid by Tenant and this Lease shall terminate on the date specified in Landlord's written notice to Tenant.  Landlord shall give Tenant written notice of its decisions, estimates or elections under this Section within sixty (60) days after any such damage or destruction.  If this Lease is not terminated, Landlord shall commence and prosecute with all due diligence restoration of the Premises.  Notwithstanding anything contained in this Section to the contrary, Landlord shall only be obligated to restore the Premises to the extent of the insurance proceeds actually received, but if the insurance proceeds actually received do not permit Landlord to restore the Premises, Landlord shall so notify Tenant and either Landlord or Tenant may terminate this Lease by written notice given within sixty (60) days after Landlord's notice.  If Landlord restores the Premises or the Project in accordance with the provisions of this Section, then Tenant shall not have any right to terminate this Lease because of such damage pursuant to any common law rights. For the avoidance of doubt, government actions for the purpose of protecting public safety or otherwise requiring the Premises, the Building and/or businesses to close shall not be deemed a casualty, and this Section 5 shall not apply thereto but

shall only apply in the event of a casualty which degrades the physical or structural integrity of the Premises or the Building.

6.    MAINTENANCE AND REPAIRS.

6.1    <u>CONDITION ON COMMENCEMENT:</u>  By accepting occupancy, Tenant shall be deemed to have agreed that the Premises are in a clean and sanitary condition and good state of repair, and in a condition suitable for the use authorized under this Lease.

6.2    <u>LANDLORD'S DUTIES:</u>  Subject to reimbursement by Tenant as set forth in Section 2, Landlord shall maintain in a good state of repair, the exterior of the roof and walls, and all structural portions of the roof, walls, floors, and foundations, common areas, heating, air conditioning, sprinkler and mechanical and electrical systems, and all sewer and utility lines of the Building, including, but not limited to, all sewer connections, plumbing, heating appliances, wiring (not installed by or for Tenant), and glass, in good order and repair, except for any repairs caused by the wrongful or negligent act of Tenant and/or its agents, and shall furnish Tenant all Building standard florescent bulb replacement in all areas and all incandescent bulb replacement in the common areas and service areas within the Building.  Notwithstanding anything to the contrary contained herein and except as otherwise provided in the preceding sentence, Landlord shall have no obligation to maintain, replace, or repair any other improvements located within the Premises, the maintenance of which is and shall be the responsibility of Tenant.  Landlord agrees to provide standard janitor cleaning service for the Premises, Saturdays, Sundays and holidays excepted.  Tenant agrees that Landlord shall not be held liable for failure to supply such services or any of them, it being understood that Landlord reserves the right to temporarily discontinue such services, or any of them, at such times as may be necessary by reason of accident, repairs, alterations or improvements.  As used in this Section 6.2, the term "<u>holidays</u>" shall mean New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving Day, and Christmas Day.

Tenant is advised that during the air conditioning season the normal business hours for air conditioning of the Premises are from 7 AM to 6 PM, Monday thru Friday, 7 AM to 1 PM, Saturday, and Tenant is further advised that special arrangements may be made for normal air conditioning at other hours, upon payment of Landlord's actual cost of providing such service.

Tenant is further advised that during the heating season the normal business hours for heating of the Premises are from 7 AM to 6 PM, Monday thru Friday, 7 AM to 1 PM, Saturday, and that the Premises receive reduced heating during other hours.  Tenant is further advised that special arrangements may be made for normal heating at other hours, upon payment of Landlord's actual cost of providing such service.

The parties acknowledge that Landlord's current charge for after-hours HVAC service is $25.00 per service hour per zone, which is subject to adjustment from time to time.

Tenant acknowledges that Landlord may be required to adjust temperatures in the Building to conform to regulations established by outside authorities and such conformance by Landlord shall take precedence over the terms of this Lease.

10

Should Tenant's fully connected electrical design load exceed the Building standard rated electrical design load for either low or high voltage electrical consumption, or if Tenant's electrical design requires low voltage or high voltage circuits in excess of Tenant's share of the Building standard circuits, Tenant shall be responsible for complying with any of Landlord's requirements in connection therewith, including, without limitation, installing (at Tenant's expense) one (1) additional high voltage panel and/or one (1) additional low voltage panel with associated transformer (which additional panels and transformers shall be hereinafter referred to as the "additional electrical equipment"). If the additional electrical equipment is installed because Tenant's low or high voltage rated electrical design load exceeds the applicable Building standard rated electrical design load, then a meter may also be added at Landlord's option (at Tenant's expense) to measure the electricity used through the additional electrical equipment.

The design and installation of any additional electrical equipment (or related meter) required by Tenant shall be subject to the prior approval of Landlord (which approval shall not be unreasonably withheld). All expenses incurred by Landlord in connection with the review and approval of any additional electrical equipment shall also be reimbursed to Landlord by Tenant. Tenant shall also pay on demand the actual metered cost of electricity consumed through the additional electrical equipment (if applicable), plus any actual accounting expenses incurred by Landlord in connection with the metering thereof.

If any of Tenant's electrical equipment requires conditioned air in excess of Building standard air conditioning, Tenant shall pay all design, installation, metering and operating costs relating thereto, all of which shall be subject to Landlord's prior approval.

If Tenant requires that certain areas within the Premises must operate in excess of the normal Building operating hours set forth above, at Landlord's option the electrical service to such areas may be separately circuited and metered such that Tenant shall be billed the costs associated with electricity consumed during hours other than Building operating hours. Any above-standard services provided to Tenant shall be provided at Tenant's expense, which Tenant shall pay promptly upon being invoiced therefor.

6.3    TENANT'S DUTIES: Subject to Landlord's obligation to provide janitorial services, Tenant at its sole cost and expense shall maintain in a clean and sanitary condition and a good state of repair, to include replacement, all other portions of its Premises, including but in no way limited to finishes, wall coverings, carpets, floor coverings, interior plumbing, wiring and interior glass in such a manner so that the Premises are maintained in good condition and suitable for Tenant's intended commercial purpose and all fixtures and equipment, under the supervision and with the approval of Landlord and within any reasonable period of time specified by Landlord.

6.4    FAILURE TO PERFORM: In the event Tenant fails to maintain the Premises pursuant to this Lease, Landlord shall give Tenant written notice to do such acts as are reasonably required to so maintain the Premises. In the event Tenant fails to promptly commence such work and diligently prosecute it to completion, then Landlord shall have the right to do such acts and expend such funds at the expense of Tenant as are reasonably required to perform such work. Any amount so expended by Landlord shall be paid by Tenant promptly after demand. Landlord shall have no liability to Tenant for any damage, inconvenience or interference with the use of the Premises by Tenant as a result of performing any such work, except to the extent of any

11

damage arising from the gross negligence or intentional misconduct of Landlord or its agents, employees or contractors.

6.5   <u>WAIVER BY TENANT:</u> Tenant waives all rights to make repairs at the expense of Landlord as provided for in any statute or law in effect at the time of execution of this Lease or any amendment thereof or any other statute or law which may be hereafter enacted during the Term of this Lease.

6.6   <u>COMPLIANCE WITH LAWS:</u> Landlord and Tenant, as to the portion of the Premises required to be maintained by them, each shall do all acts required to comply with all applicable laws, ordinances, regulations and rules on any public authority or organization relating to the maintenance of the Premises. Tenant represents and covenants that it shall conduct its occupancy and use the Premises (and if necessary place the Premises) in accordance and compliance with the Americans With Disabilities Act of 1990, as amended ("ADA") (including, but not limited to, modifying its policies, practices and procedures, and providing auxiliary aids and services to disabled persons, if so required by law). Furthermore, Tenant covenants and agrees that any and all alterations or improvements made by Tenant to the Premises shall comply with the ADA.

6.7   <u>CONDITION AT END OF TERM:</u> Upon the termination of this Lease or upon the expiration of the Term of this Lease, Tenant shall surrender the Premises in the same condition as received, ordinary and reasonable wear and tear and damage by fire, earthquake, act of God or the elements alone excepted.

7.    ALTERATIONS.

7.1   <u>TENANT'S RIGHT TO MAKE:</u> Tenant shall not make or permit to be made any alteration or changes in or additions to the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. No work shall be commenced until Landlord shall have posted proper notices of non-responsibility if required by applicable law. Notwithstanding any provision in this Lease, but subject to Section 6.7 above, Tenant may make immaterial alterations, additions or improvements to the Premises, without the need to obtain Landlord's approval (including, without limitation, hanging pictures and other decorative items which do not affect the structural integrity of the Building or the Premises and shall be permitted to use nails, hangers and other such non-destructive customary devices in connection therewith whether or not they penetrate the wall). All repairs, alterations, additions and improvements done by Tenant within the Premises shall be performed in a good and workmanlike manner, in compliance with all governmental requirements. Whenever Tenant proposes to do any construction work requiring Landlord's consent within the Premises, Tenant shall first furnish to Landlord plans and specifications covering such work in such detail as Landlord may reasonably request. Such plans and specifications shall comply with such requirements as Landlord may from time to time reasonably prescribe for construction at or about the Premises. In no event shall any non-immaterial construction work be commenced in, at or about the Premises without Landlord's prior written approval of such plans and specifications. Within ten (10) business days of Tenant's delivery to Landlord of Tenant's proposed plans and specifications for alterations, additions or improvements in or about the Premises and Tenant's request for approval thereof, Landlord shall approve or reject the proposed plans and specifications and Landlord shall otherwise act promptly

12

and in good faith upon written request from Tenant (but without cost or expense to Landlord) to facilitate Tenant's completing alterations, additions or improvements which are approved by Landlord in accordance with the terms of this Lease. In the event Tenant does perform any construction work without the prior written approval of Landlord, Landlord shall, in addition to all other remedies it might have hereunder or at law, have the right to require Tenant to immediately remove any unapproved additions or improvements and restore the Premises to the condition existing prior to such unauthorized construction. Without limiting the generality of the foregoing, Tenant shall under no circumstances make any penetration of the roof or walls (except as permitted above) or floor slab of the Premises without Landlord's consent. In the event Landlord consents to the penetration of the roof or walls or floor slab of the Premises, all such work shall be performed by contractors designated or approved by Landlord and shall be supervised by Landlord or its designees and performed under conditions and subject to such conditions and requirements as may be established by Landlord. Tenant shall and hereby agrees to indemnify and hold Landlord harmless from and against any and all losses, costs, damages, expenses or liability (including, without limitation, court costs and reasonable attorneys' fees), suffered or incurred by Landlord as a result of any penetration of the roof or walls of the Premises, including, without limitation, costs of repair, loss of income, damages to other occupants of the Building to the extent Landlord is liable therefor and damages which result if any warranty on the roof held or maintained by the Landlord is voided or impaired by such penetration. The provisions hereof shall survive the termination of the Lease.

      7.2   OWNERSHIP AND REMOVAL: All alterations, changes and additions made to or on the Premises shall be made at the sole cost and expense of Tenant and, upon completion, except trade fixtures, shall become part of the Premises, and the property of Landlord and upon termination of this Lease or upon expiration of the Term shall be surrendered to the Landlord. Upon the termination of this Lease, or by written notice delivered at least fifteen (15) business days prior to the expiration of the Term, Landlord shall have the right to require Tenant at its sole expense, to remove from the Premises as of the end of the Term all fixtures and equipment placed or installed on the Premises by Tenant with any damage caused to the Premises by such removal to be repaired by and at the expense of Tenant.

      8.   LIENS.

      8.1   TENANT'S OBLIGATION: Tenant shall keep the Premises and the Building free and clear of any liens arising out of work performed or caused to be performed by Tenant and shall indemnify, hold harmless and defend Landlord from any liens and encumbrances arising out of any work performed or materials furnished by or at the direction of Tenant. In the event any lien is filed, Tenant shall do all acts necessary to discharge any lien within thirty (30) days of filing, or if Tenant desires to contest any lien, then Tenant shall deposit with Landlord such security as Landlord shall demand to insure the payment of the lien claim. In the event Tenant shall fail to pay any lien claim when due or shall fail to deposit the security with Landlord, then Landlord shall have the right to expend all sums necessary to discharge the lien claim, and Tenant shall pay promptly after demand all reasonable sums expended by Landlord in discharging any lien, including reasonable attorneys' fees and costs.

      9.   ENTRY.

9.1    RIGHTS OF LANDLORD: Landlord and its agents shall have the right at any reasonable times during business hours upon reasonable prior written notice to Tenant, except in the case of an emergency, to enter upon the Premises for the purpose of inspection, serving or posting notices, showing to a prospective purchaser or tenant, or making any changes or alteration or repairs which Landlord shall deem necessary for the protection, improvement or preservation of the Premises or the Building for any other lawful purpose. At any time after ninety (90) days prior to the expiration of the Term of this Lease, Landlord may place thereon any usual or ordinary "For Lease" or "For Sale" signs. Landlord or Landlord's agents shall have the right to enter the Premises to perform the janitorial services as set forth herein. Notwithstanding the foregoing, Landlord agrees, during the exercise of its rights under this Section 9.1, that (i) Landlord shall use commercially reasonable efforts to minimize interference with Tenant's business and operations in the Premises, and (ii) Tenant shall have the right, if it so elects, to have an agent or employee of Tenant accompany Landlord, to the extent reasonably practical.

10.    INDEMNIFICATION. Tenant shall defend, indemnify and save Landlord harmless from and against any and all suits, claims, losses, damages and demands, including reasonable attorney's fees, arising out of injury, death or damage occurring in, at or about the Premises as a result of the acts or omissions of Tenant, its contractors, agents, servants, employees or visitors. In the event Landlord is notified of a claim, action or proceeding, or becomes aware of an occurrence, which may result in an indemnification by Tenant of Landlord as provided above, Landlord shall give prompt notice to Tenant and provide the particulars known by Landlord. Landlord shall promptly forward to Tenant every demand, notice, summons or other process received by Landlord or its representatives to which this indemnification applies. The foregoing indemnity will survive the expiration or termination of this Lease.

11.    DEFAULT AND REMEDIES.

11.1    EVENTS: The occurrence of any of the following shall, at the option of Landlord, constitute a material default and breach of this Lease by Tenant (an "Event of Default").

(a)    Any failure by Tenant to pay the rent or additional rent or charges, or to make any other payment required to be made by Tenant hereunder as and when due shall constitute an immediate Event of Default. Prior to Landlord exercising its remedies set forth below following such monetary Event of Default, Landlord agrees to give Tenant one (1) written notice each 12-month period and five (5) business days from Tenant's receipt (or deemed receipt) of such written notice within which to cure such Event of Default. Payment within such five (5) business day period shall fully cure such default, and Landlord shall not be entitled to take any actions contemplated under Section 12.2 in connection with such Event of Default.

(b)    The abandonment of the Premises by Tenant.

(c)    A failure by Tenant to observe or perform any other provision of this Lease to be observed or performed by Tenant, where such failure continues for thirty (30) days after written notice thereof by Landlord to Tenant provided however, that if the nature of such default is such that the same cannot reasonably be cured within such thirty (30) day period commence such cure and thereafter diligently prosecute the same to completion.

14

(d)     A failure of Tenant to maintain the insurance coverage required herein and such failure continues for five (5) business days after written notice from Landlord.

(e)     The making by Tenant of any general assignment for the benefit of creditors; the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt or of a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days); appointment of a trustee or receiver to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where possession is not restored to Tenant within thirty (30) days or the attachment, execution or other judicial seizure of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days.

11.2   <u>REMEDIES</u>: Upon the occurrence of any Event of Default, Landlord shall have the option to pursue any one or more of the following remedies without any notice or demand whatsoever except as otherwise expressly provided:

(a)     Landlord, with or without terminating this Lease, may, without prejudice to any other remedy Landlord may have for possession, arrearages in rent or damages for breach of contract or otherwise, immediately or at any time thereafter, re-enter the Premises and expel or remove therefrom Tenant and all persons and entities claiming by or through Tenant (including, without limitation, any and all sublessees and assigns) and all property belonging to or placed on the Premises by, at the direction of,  or with the consent of Tenant or its assignees or sublessees, by force if necessary, without being liable to prosecution or any claim for damages therefor; and Tenant agrees to indemnify Landlord for all loss and damage which Landlord may suffer by reason of such termination of this Lease or of Tenant's right to possession hereunder, whether through inability to relet the Premises or through decrease in rent or otherwise.  Landlord may, at its option and with or without terminating this Lease, also declare the difference, if any, between (i) the entire amount of the rent and additional charges which would become due and payable during the remainder of the Term of this Lease, discounted to present value using a discount rate equal to the Prime Rate in effect as of the date of such declaration, and (ii) the fair rental value of the Premises during the remainder of the Term of this Lease (taking into account, among other factors, the anticipated duration of the period the Premises will be unoccupied prior to reletting and the anticipated cost of reletting the Premises), also discounted to present value using a discount rate equal to the Prime Rate in effect as of the date of such declaration, to be due and payable immediately, in which event such sum shall be due and payable immediately and Tenant agrees to pay the same at once, together with all rent, additional rent, and other sums theretofore due, it being understood and agreed that such payment shall be and constitute Landlord's liquidated damages, Landlord and Tenant acknowledging and agreeing that it is difficult or impossible to determine the actual damages Landlord would suffer from Tenant's breach hereof and that the agreed upon liquidated damages are not punitive or penalties and are just, fair and reasonable, all in accordance with O.C.G.A. §13-6-7.

(b)     Landlord, with or without terminating this Lease, may immediately or at any time thereafter relet the Premises or any part thereof for such time or times, at such rent or rents, and upon such other terms and conditions as Landlord in its sole discretion may deem advisable, and Landlord may make any alterations or repairs to the Premises which it may deem necessary or proper to facilitate such reletting; and Tenant shall pay all reasonable costs of such

15

reletting including, but not limited to, the cost of any such alterations and repairs to the Premises, attorneys' fees and brokerage commissions; and if this Lease shall not have been terminated, Tenant shall continue to pay all rent, additional rent, and all other charges due under this Lease up to and including the date of beginning of payment of rent by any subsequent tenant of part or all of the Premises, and thereafter Tenant shall pay monthly during the remainder of the Term of this Lease the difference, if any, between the rent, additional rent, and other charges collected from any such subsequent tenant or tenants and the rent, additional rent, and other charges reserved in this Lease, but Tenant shall not be entitled to receive any excess of any such rents collected over the rent and additional rent reserved herein.

(c)    The remedies provided for in this Lease are in addition to any other remedies available to Landlord at law on in equity by statute or otherwise. All remedies in this Lease are cumulative and may be exercised alternatively, successively or in any other manner. The exercise by Landlord of any one or more of the rights and remedies provided in this Lease shall not prevent the subsequent exercise by Landlord of any one or more of the other rights or remedies herein provided. Failure of Landlord to declare an Event of Default immediately upon its occurrence, or delay in taking any action in connection with Event of Default, shall not constitute a waiver of the default, but Landlord shall have the right to declare the default at any time while such an Event of Default remains uncured and takes such action as is lawful or authorized under this Lease.

11.3    LANDLORD'S RIGHT TO CURE: Except as may be expressly provided in this Lease to the contrary, all agreements and provisions to be performed by Tenant under any of the terms of this Lease shall be at the sole cost and expense of Tenant and without any abatement of rent or additional rent. If Tenant shall fail to pay any sums of money, other than rent or additional rent, required to be paid by it hereunder, or violates any provision of this Lease and such failure or violation shall continue for thirty (30) days after written notice thereof by Landlord, Landlord is hereby empowered and Landlord may, but shall not be obligated so to do, and without waiving or releasing Tenant from any obligations of Tenant or any other right or remedy of Landlord under this Lease or otherwise, make any such payment, perform any such other act or correct any such violation on Tenant's part to be made, performed or observed as in this Lease provided. All sums so paid by Landlord and all such necessary incidental expenses shall accrue simple interest at the Default Rate from demand until payment, and Tenant shall pay to Landlord such accrued interest together with such sums and expenses.

11.4    ATTORNEY'S FEES: In the event of any legal matter, dispute, action or proceeding that is commenced by or between Landlord and/or Tenant under this Lease, the prevailing party shall be reimbursed the reasonable attorneys' fees and court costs actually incurred with respect to such matter.

12.    ASSIGNMENT AND SUBLETTING.

12.1    ASSIGNING AND SUBLETTING: Tenant shall not sublet the Premises or any part thereof and Tenant shall not assign, transfer, pledge, mortgage or otherwise encumber this Lease, or any portion thereof, without the previous written consent in each instance of Landlord (which consent shall not be unreasonably withheld, conditioned or delayed), and Tenant shall furnish to Landlord a copy of such proposed instrument. Tenant acknowledges that Landlord shall

16

not consent to any assignment or sublease which would result in a violation of the Assignment Limitations set forth on Exhibit F attached hereto. Permission is, however, granted Tenant to assign this Lease and also to sublet the Premises to any subsidiary corporation of Tenant, or parent or affiliated corporations of Tenant, upon giving Landlord written notice of intent to so do. In the event of any assignment or subletting, Tenant shall remain the principal obligor to the Landlord under all covenants of this Lease. By accepting any assignment or subletting, an assignee or sublessee shall become bound by and shall perform and shall become entitled to the benefit of all of the terms, conditions and covenants by which the Tenant hereunder is bound. An assignment, which would require consent within the meaning of this Section, shall be deemed to include a sale of all or substantially all of Tenant's assets or one or more sales or transfers, by operation of law or otherwise, or creation of new stock, by which an aggregate of more than 50% of Tenant's stock shall be vested in a party or parties who are non-stockholders as of the date hereof. Said consent shall not apply if Tenant's stock is listed on a recognized security exchange.

In the event of a sale of all or substantially all of Tenant's assets, the purchaser thereof shall be deemed to assume all of Tenant's obligations under this Lease from and after the date of such acquisition, whether or not assumed in writing. In connection with such sale, Tenant shall cause the purchaser to execute an assumption agreement reasonably acceptable to Landlord.

12.2    NO RELEASE OF TENANT. No assignment or subletting, be it with or without the consent of Landlord, shall release Tenant from its obligations under this Lease nor shall Tenant permit this Lease or any interest herein or in the tenancy hereby created to become vested in or owned by any other person, firm, or corporation by operation of law or otherwise. In addition, no assignment or subletting, be it with or without the consent of Landlord, shall release any guarantor (if any) from its obligations under any guaranty of this Lease. If Tenant shall assign this Lease or sublet the Premises in any way not authorized by the terms hereof, the acceptance by Landlord of any rent from any person claiming as assignee, subtenant, or otherwise shall not be construed as a recognition of or consent to the assignment or subletting or as a waiver of the right of Landlord thereafter to collect any rent from Tenant, it being agreed that Landlord may at any time accept any rent under this Lease from any person offering to pay it without thereby acknowledging the person so paying as a Tenant in place of Tenant herein named, and without releasing Tenant from the obligations of this Lease, and without recognizing the claims under which such person offers to pay any rent, but it shall be taken to be a payment on account by Tenant. While the Premises or any part thereof are subject to an assignment, sublease or other transfer, Landlord may collect directly from such transferee all rents or other sums relating to the Premises becoming due to Tenant or Landlord and apply such rents and other sums against the rent and any other sums payable hereunder. If the aggregate rental, bonus or other consideration paid by a transferee for any such space exceeds the sum of (a) Tenant's rent to be paid to Landlord for such space during such period and (b) Tenant's costs and expenses actually incurred in connection with such transfer, including reasonable brokerage fees, reasonable costs of finishing or renovating the space affected and reasonable cash rental concessions, which costs and expenses are to be amortized over the term of the transfer, then such excess shall be paid to Landlord within fifteen (15) business days after such amount is earned by Tenant. Such overage amounts in the case of a sublease shall be calculated and adjusted (if necessary) based on consecutive 12-month periods, and there shall be no cumulative adjustment for the Term. Landlord shall have the right to audit Tenant's books and records relating to the transfer. Tenant authorizes its transferees to make payments of rent and any other sums due and payable, directly to Landlord upon receipt of notice

17

from Landlord to do so. Any attempted Transfer by Tenant in violation of the terms and covenants of this Article 13 shall be void and shall constitute a default by Tenant under this Lease. In the event that Tenant requests that Landlord consider a sublease or assignment hereunder, Tenant shall pay (i) Landlord's reasonable fees incurred in connection with the consideration of such request, and (ii) all attorneys' fees and costs incurred by Landlord in connection with the consideration of such request or such sublease or assignment.

12.3    VIOLATION: No consent to any assignment, voluntarily or by operation of law, of this Lease, or any subletting of the Premises shall be deemed to be a consent to any subsequent assignment or subletting except as to the specific instance covered thereby.

13.    EXERCISE OF EMINENT DOMAIN.

13.1    PREMISES TAKEN: If (a) any material portion of the Premises shall be permanently taken or condemned, this Lease shall, upon written notice from either party, terminate as of the date of such condemnation or taking, or (b) more than fifteen percent (15%) of the Building, or such lesser portion as Landlord deems material for the operation of the Building, shall be permanently taken or condemned, this Lease shall, upon written notice from Landlord, terminate as of the date of such taking. If not terminated as provided above, this Lease shall continue in full force and effect and Rent shall be partially abated based on the number of square feet of rentable area taken. All proceeds payable on account of any interest in the Premises and/or the Building to either or both parties to this Lease from any taking or condemnation of the Premises shall belong to and be paid to Landlord. Nothing contained herein shall prevent Tenant from seeking and retaining a separate award from the condemning authority in any proceeding involving a taking or a sale in lieu of a taking, for Tenant's trade fixtures, equipment or relocation expenses to the extent that such action does not reduce the award distributable to Landlord on account of the value of the Premises. For the avoidance of doubt, government actions for the purpose of protecting public safety or otherwise requiring the Premises, the Building and/or businesses to close shall not be deemed a condemnation or taking, and this Section 13 shall not apply thereto.

13.2    PREMISES REMAINING: If Tenant or Landlord does not terminate this Lease in accordance with the foregoing, Landlord shall proceed with due diligence to restore the improvements to an architectural whole substantially to their former condition to the extent feasible, and this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the rent shall be reduced in the proportion that the floor area taken bears to the total floor area of the Premises. Any award for the taking of all or any part of the Premises shall be the property of Landlord, whether such award shall be made as compensation for diminution in value of the leasehold or for the taking of the fee, or as severance damages; provided however, the Tenant shall be entitled to make a separate claim for moving expense as a result of such condemnation, loss or damage to Tenant's trade fixtures and removable personal property or any other claim that may be allowed by law, so long as it doesn't otherwise reduce Landlord's award. Tenant shall have no claim against Landlord for the value of any unexpired Term of this Lease or otherwise.

14.    HOLDING OVER. Any holding over after the expiration of the Term of this Lease by Tenant shall be deemed to be a tenancy from month to month terminable on thirty (30) days written notice, and except for the Term thereof shall be on the same terms and conditions specified

18

herein, except that the monthly rental shall be one hundred fifty percent (150%) of the rent for the last month of the Term of the Lease, including any renewals or extensions. If Tenant remains in possession after the expiration of the Term, without Landlord's acquiescence or consent, Tenant shall become a tenant-at-sufferance subject to eviction without notice. In the event of any unauthorized holding over, Tenant shall indemnify Landlord against all claims for damages by any tenant to whom Landlord may have leased all or any part of the Premises effective upon the termination of this Lease and for any other liability, loss, cost, damage or expense (including attorneys' fees, disbursements of counsel and any costs of suit) incurred by Landlord as a result of such holding over, and neither the provisions of this Section nor the acceptance of any Rent hereunder shall prevent Landlord from exercising any remedy to regain immediate possession of the Premises. This Section 14 shall survive the termination of the Lease, by lapse of time or otherwise. Any holding over shall not be deemed a renewal of this Lease by operation of law or otherwise.

15.    SUBORDINATION.

15.1    SUBORDINATION:  This Lease may be subject and subordinate to any first mortgage or deed to secure debt placed upon the Premises by any bank, insurance company, or institutional lender of the like character (herein called the "Mortgagee"), all without the necessity of having further instruments executed on the part of Tenant to effectuate such subordination. While this Section 15.1 is self-operative, and no further instrument of subordination shall be necessary, Tenant shall, in confirmation of such subordination, within fifteen (15) days of written demand, at any time or times, execute, acknowledge and deliver to Landlord or the Mortgagee, a Subordination, Non-Disturbance and Attornment Agreement, as reasonably requested by Landlord or the Mortgagee.

15.2    ESTOPPEL CERTIFICATE:  Tenant shall, without charge, at any time and from time to time, within ten (10) business days after written request by Landlord, deliver a written instrument to Landlord or any other person, firm or corporation specified by Landlord, duly executed and acknowledged, certifying that this Lease is unmodified and in full force and effect, or if there has been any modification, that the same is in full force and effect as so modified, and identifying any such modifications; whether or not there are then existing any set-offs or defenses in favor of Tenant against the enforcement of any of the terms covenants and conditions of this Lease by Landlord, and if so, specifying the same, and also whether or not Landlord has observed and performed all of the terms, covenants and conditions on the part of Landlord to be observed and performed, and if not, specifying the same; and the dates to which rent and all other charges hereunder have been paid; and such other matters as reasonably requested by Landlord or its Mortgagee.

15.3 MORTGAGEE PROTECTION:  Tenant agrees to give any Mortgagees and/or other security deed holders, by registered or certified mail, a copy of any notice of default served upon the Landlord, provided that prior to such notice Tenant has been notified, in writing of the address of such Mortgagees and/or security deed holders. Tenant further agrees that if Landlord shall have failed to cure such default within the time provided for in this Lease, then the Mortgagees and/or security deed holders shall have an additional sixty (60) days within which to cure such default or if such default cannot be cured within that time, then such additional time as may be necessary if within such sixty (60) days, any Mortgagee and/or security deed holder has

19

commenced and is diligently pursuing the remedies necessary to cure such default (including, but not limited to, commencement of foreclosure proceedings, if necessary to affect such cure), in which event this Lease shall not be terminated while such remedies are being so diligently pursued.

15.4    ATTORNMENT: If this Lease is not extinguished by exercise of a power of sale, Tenant shall, in the event any proceedings are brought for the foreclosure of said Premises, or in the event of exercise of power of sale under any mortgage, security deed or deed of trust made by the Landlord covering the Premises (or by deed in lieu thereof), or in the event of a sale by Landlord of its fee or leasehold interest in the property or its interest in this Lease attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as Landlord under this Lease.

16.    SIGNS.

16.1    RIGHT OF LANDLORD: Landlord reserves the right to the use of the exterior walls and the roof of the Premises and of the Building.

16.2    RESTRICTIONS ON TENANT: Tenant shall not inscribe, paint, affix or place any signs or advertisements on the exterior, interior or roof the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Any signs to be placed by Tenant shall be removed by the Tenant upon demand by the Landlord following the expiration or termination of this Lease, and any damage caused by such removal shall be repaired at the expense of Tenant. Additionally, Tenant acknowledges that signage covenants are in full force and effect within the Project and further agrees that all signage shall conform with said covenants. Landlord shall provide Tenant, at Landlord's sole cost and expense, with suite entry signage and a listing in the Building's main lobby tenant directory using building standard materials and colors.

16.3    MONUMENT SIGNAGE: So long as this Lease is in full force and effect, Tenant is not in monetary default hereunder beyond any applicable notice and cure periods, and Tenant is leasing and occupying the entirety of the Premises, Tenant shall have the non-exclusive right (the "Signage Right") to have its identification signage ("Tenant's Panel") installed by Landlord on one (1) of the existing monument signs for the Building (the "Monument Sign"), such signage right being subject to the following terms and conditions:

(a)    Tenant shall elect in writing prior to the Commencement Date on which of the existing monument signs for the Building Tenant would like Tenant's Panel placed. The location of Tenant's Panel on the Monument Sign shall be designated by Landlord and the design, construction, size, and all other aspects of Tenant's Panel shall be building standard and subject to Landlord's prior written approval, which approval shall not be unreasonably withheld, and shall be subject to the approval of all governmental agencies or authorities having jurisdiction over the Building, and shall be subject to all applicable rules, regulations ordinances and laws, including, without limitation, zoning ordinances.

(b)    The expense of the initial installation and construction and any maintenance of Tenant's Panel shall be the sole cost and expense of Landlord; provided, however, that Tenant shall be responsible for any and all costs and expenses associated with any changes to

20

Tenant's Panel after such initial installation. Upon the removal of Tenant's Panel, Tenant shall pay all costs associated with restoring the Monument Sign to substantially the same condition that existed prior to the installation of Tenant's Panel, reasonable wear and tear excepted.

(c)    If Tenant requests any assignment or subletting of this Lease, Tenant's Signage Right as contained in this Section 16.3 shall not be transferable or assignable to an assignee or subtenant without the express prior written consent of Landlord, which consent may be granted, withheld or conditioned in Landlord's sole and absolute discretion.

(d)    Subject to availability, Tenant shall also have the right, by providing written notice thereof to Landlord on or before the Commencement Date, to install a second (2nd) panel on the other presently-existing monument sign for the Building (the "Second Monument Sign"), subject to all of the terms and conditions of this Section 16.3 (such panel being the "Second Panel"); provided, however, that all costs and expenses associated with the Second Panel (including, without limitation, construction, installation, design, maintenance and removal) shall be Tenant's sole responsibility. Notwithstanding anything in this Lease to the contrary, Tenant agrees that Landlord shall have the right, at any time and for any reason, at Landlord's sole cost and expense, to either (i) remove the Second Panel from the Second Monument Sign or (ii) relocate the Second Panel to another location on the Second Monument Sign.

(e)    The terms of this Section 16.3 shall survive the expiration or earlier termination of this Lease.

17.    CONTROL OF COMMON AREAS AND USE OF PARKING AREAS.

17.1    EMPLOYEE PARKING AREA: Tenant and its employees shall park their motor vehicles in such areas as Landlord shall from time to time designate as employee parking areas. Tenant agrees that all loading and unloading operations shall be conducted so as not to obstruct or hinder the operation of the businesses of the other tenants in the Building, nor will Tenant unreasonably block or obstruct any street, sidewalk or right-of-way adjacent to or comprising part of the Building. Tenant's occupancy shall include the use of 4 parking spaces per 1,000 rentable square feet of space in the Premises. Such parking spaces shall be non-exclusive parking spaces for Tenant's employee and/or customer parking on a first-come first-served basis at no cost to Tenant. Should Tenant exceed such parking ratio or otherwise overburden the parking areas, Landlord will have the right to institute controls over the parking areas, including, without limitation, implementing a parking tag or other identification system, towing cars and/or booting cars. In addition, if Tenant exceeds such parking ratio or otherwise overburdens the parking areas and fails to correct same within five (5) business days of its receipt of written notice from Landlord, such failure will constitute an Event of Default entitling Landlord to immediately exercise its rights and remedies under this Lease.

17.2    CONTROL OF COMMON AREAS: All parking areas, driveways, entrances and exits thereto, pedestrian sidewalks and ramps, landscaped areas, exterior stairways and all other common areas and facilities provided by Landlord for the common use of tenants of the Building and their officers, agents, employees and customers, shall at all times be subject to the exclusive control and management of Landlord, and Landlord shall have the right from time to time to establish, modify and enforce reasonable rules and regulations with respect to the use of all

21

such common areas and facilities.  Landlord shall have the right to operate and maintain the same in such manner as Landlord, in its sole discretion, shall determine from time to time, including without limitation, the right to employ all personnel and to make all rules and regulations necessary for the proper operation and maintenance of said common areas and facilities.  All such costs above the costs for the Base Year to be shared by Tenant as provided for in Section 2.

18.    GENERAL PROVISIONS.

18.1    OBLIGATION OF TENANT:  Tenant agrees to conduct its business in a manner that will not be objectionable to other tenants in the Building, including noise, vibration, odor, or fumes.  In the event Landlord receives complaints from other tenants in the Building and determine, in its sole reasonable judgment, that Tenant is conducting its operations in a manner so as to be objectionable to other tenants, Tenant agrees, upon notice from Landlord thereof, to promptly modify the conduct of its operations to eliminate such objectionable operations.  In such event that said conduct is not modified, Tenant shall be deemed in default of its obligations under this Lease.

18.2    QUIET ENJOYMENT:  Provided Tenant performs all of its covenants and obligations hereunder, Landlord covenants that Tenant shall have peaceful and quiet enjoyment of the Premises  without hindrance on the part of Landlord and Landlord will warrant and defend Tenant in the peaceful and quiet enjoyment of the Premises against claims of all persons claiming through or under the Landlord.

18.3    TRANSFER OF LANDLORD'S INTEREST IN PREMISES:  In the event any sale or exchange of the Premises by Landlord and assignment by Landlord of this Lease, the Landlord shall be entirely freed and relieved of its covenants and obligations contained in, or derived from the Lease arising out of any act, occurrence or omission relating to the Premises or this Lease occurring after the consummation of such sale or exchange and assignment, provided however, that the new owner shall assume and agree to perform all the covenants and obligations of Landlord contained herein.  In the event of such sale or exchange, this Lease shall nevertheless remain unimpaired and in full force and effect and Tenant hereunder agrees to attorn to the then owner of the leased Premises.

18.4    OBLIGATIONS OF SUCCESSORS:  The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate section hereof, and that all of the provisions hereof shall bind and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

18.5    CAPTIONS:  The captions of the articles and sections contained in this Lease are for convenience only and shall not be deemed to be relevant in resolving any questions of interpretation or construction of any article or section of this Lease.

18.6 NOTICES:  Whenever under this Lease provision is made for any demand, notice or declaration of any kind, or where it is deemed desirable or necessary by either party to give or serve any such notice, demand or declaration to the other party, it shall be in writing and served either personally or sent by certified mail, postage prepaid, or by overnight courier service,

22

addressed at the addresses set forth below.  Notices may also be delivered by electronic ("email") delivery provided that one of the other approved methods of delivery is also utilized.  Either party may, by like notice at any time and from time to time, designate a different address to which notices shall be sent.  Such notices, if mailed, shall be considered sufficiently served or given, for all purposes herein, at the time they shall be postmarked by the United States Postal Service, or if delivered upon date of actual delivery if personally delivered or sent by overnight courier service. Notices may be delivered by either party's attorney and notices from Landlord may also be sent by the Building's Property Manager.

18.7    APPLICABLE LAW:  This Lease shall be governed and interpreted solely by the laws of the State of Georgia then in force.  Each number, singular or plural, as used in this Lease shall include all numbers, and each gender shall be deemed to include all genders.

18.8    TIME AND JOINT AND SEVERAL LIABILITY:  Time is of the essence of this Lease and each and every provision hereof, except as to the conditions relating to the delivery of possession of the Premises to Tenant.  All the terms, covenants and conditions contained in this Lease to be performed by either party, if such party shall consist of more than one person or organization, shall be deemed to be joint and several, and all rights and remedies of the parties shall be cumulative and non-exclusive of any other remedy.

19.    ADDITIONAL PARAGRAPHS.

19.1    It is agreed between the Landlord and Tenant that there are no oral agreements or representations between the parties hereto affecting this Lease and this Lease supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements, representations and understanding, if any, between the parties hereto or between the parties hereto and any real estate broker who may represent either or both of said parties and none thereof shall be used to interpret or construe this Lease.  There are no other representations and this Lease is based solely upon the representations and agreements contained in this Lease.

19.2  This Lease shall create the relationship of landlord and tenant between Landlord and Tenant, and nothing contained herein shall be deemed or construed by the parties hereto, or by any third party, as creating the relationship of principal and agent, or of partnership, or of joint venture, or of any relationship other than landlord and tenant, between the parties hereto. No estate shall pass out of Landlord and Tenant has only a usufruct not subject to levy and sale.

19.3  Any number of counterparts of this Lease may be executed, and each such counterpart shall be deemed to be an original instrument. A facsimile signature or electronic signature shall be deemed for all purposes to be an original.

20.    REAL ESTATE COMMISSION.  Landlord acknowledges that Lincoln Property Company Commercial, Inc., on behalf of Landlord, and Lee & Associates Commercial Real Estate Services – Atlanta, LLC, on behalf of Tenant, negotiated this Lease and further agrees to pay to said brokers upon complete execution of this Lease, a leasing commission as outlined in separate agreements.  Tenant hereby indemnifies Landlord and holds Landlord harmless from and against all claims, loss, cost, damage or expense, including, but not limited to, reasonable attorney's fees actually incurred without regard to any statutory presumption and court costs, incurred by Landlord

23

as a result of or in conjunction with a claim of any other real estate agent or broker, if made by, through or under Tenant relative to this Lease.

21.   HAZARDOUS MATERIALS.   Tenant covenants and warrants to Landlord that Tenant shall not install, store, treat, transport, or dispose of, or permit the installation, storage, use treatment, transportation or disposal of, any "Hazardous Materials" on, upon or beneath the Premises. In the event of any such installation, storage, use, treatment, transportation or disposal, Tenant shall remove any such Hazardous Material, or otherwise comply with all regulations or orders of any federal, state, county, regional, local or other governmental agency or authority ("Governmental Authority"), all at the expense of Tenant. Notwithstanding the foregoing, Tenant shall not be prohibited from using, storing, or disposing of any Hazardous Material that is not prohibited by any Governmental Authority and which is used, stored or disposed of by Tenant in the normal course of Tenant's business and in quantities which are not in excess of quantities used, stored or disposed of by prudent individuals, firms or entities, conducting businesses of the same nature and purpose as the Tenant's business and which use, storage and disposal of any Hazardous Material, including the quantities thereof, are all in accordance with the manufacturer's recommendations and are in compliance with any and all laws, ordinances, rules, regulations or orders of any Governmental Authority. "Hazardous Materials" as used herein shall mean (a) asbestos in any form; (b) urea formaldehyde foam insulation; (c) transformers or other equipment which contain dye electric fluid containing a level of poly-chlorinated biphenyl in excess of 50 parts per million; (d) underground storage tanks; or (e) any other chemical, material, or substance which is regulated as toxic or hazardous or exposure to which is prohibited, limited or regulated by any Governmental Authority.

Tenant shall promptly notify Landlord in writing of any order or pending or threatened action by any regulator, agent or other Governmental Authority, or any claims made by any third party, relating to any Hazardous Materials on, or emanations from, the Premises, and shall promptly furnish Landlord with copies of any correspondence or legal pleadings in connection therewith.

Tenant hereby releases and agrees to indemnify and hold harmless Landlord and Landlord's officers, directors, shareholders, employees, attorneys and agents (collectively the "Indemnitees") from and against all loss, damage and expense (including, without limitation, attorneys' fees and costs to the extent permitted by applicable law incurred in the investigation, defense and settlement of claims) that Indemnitees may incur as a result of or in connection with the assertion against Indemnitees of any claim relating directly or indirectly, in whole or in part, to any activity caused or alleged to have been caused by Tenant on or off the Premises or any failure by Tenant to act, if such activity or failure to act involves Hazardous Materials, in whole or in part, directly or indirectly, used, stored, installed, treated, transported or disposed of on, upon or beneath the Premises during the Term of the Lease, or noncompliance with any federal, state, or local laws, ordinances, rules, regulations or orders relating thereto.

22.   OPTION TO RENEW. Subject to the rights of existing tenants in the Building as of the date of this Lease and so long as this Lease is in full force and effect and Tenant is not in default beyond applicable notice and cure periods in the performance of any of the covenants or terms and conditions of this Lease at the time of notification to Landlord or at the time of commencement of the Extension Term, as that term is hereinafter defined, Tenant shall have the

24

option (the "Extension Option") to extend the Term for the entire Premises for one (1) additional period of five (5) years (the "Extension Term"), at the Prevailing Market Rate, as that term is hereinafter defined, subject to the terms and conditions set forth in this Section 22. Tenant shall provide Landlord with written notice at least nine (9) months, but in no event more than twelve (12) months, prior to the expiration of the Term of its exercise of the Extension Option. The "Prevailing Market Rate" shall mean the then prevailing market rate for lease renewals and extensions in the Building and in similar buildings in the vicinity of the Building comparable to this Lease and the Premises. Landlord shall provide Tenant with a written proposal setting forth its determination, in its sole but reasonable discretion, of the Prevailing Market Rate to extend the Term within thirty (30) days of receipt of such notice. Tenant shall have ten (10) days from its receipt of Landlord's proposal to either accept such proposal or elect to negotiate the Prevailing Market Rate with Landlord by giving written notice thereof to Landlord; failure of Tenant to elect to negotiate the Prevailing Market Rate within said 10-day period shall be deemed an acceptance of Landlord's proposal. If Tenant elects in writing to negotiate the Prevailing Market Rate in accordance with the foregoing, Landlord and Tenant will have thirty (30) days within which to negotiate, in good faith, the Prevailing Market Rate, and if Landlord and Tenant are unable to reasonably agree upon the Prevailing Market Rate within such 30-day period, then Tenant's exercise of the Extension Option shall be null and void and of no further force or effect. Any amendment of the Lease after the date hereof that otherwise extends the Term beyond the expiration of the initial Term shall be deemed to constitute Tenant's waiver of the Extension Option, unless otherwise expressly provided in such amendment. The right granted to Tenant under this Section 22 is personal to the named Tenant, and in the event of any assignment of this Lease or sublease by Tenant, this Extension Option shall thenceforth be void and of no further force or effect.

23.     RELOCATION. Landlord may at its option and upon giving sixty (60) days prior written notice to Tenant, substitute for the Premises other premises in the Building (the "New Premises") in which event the New Premises shall be deemed to be the Premises for all purposes hereunder, provided:

(a)     The New Premises shall be comparable in size and type and quality of tenant finishes; and

(b)     The base rent and other rentals payable under this Lease shall remain the same.

Tenant shall accept possession of the New Premises in its "as-is" condition; provided, however, Landlord, at Landlord's expense, shall make reasonable improvements so that the New Premises will provide the Tenant with the same standard of quality and usefulness as the original Premises (excluding, however, non-standard improvements made or paid for by Tenant). In the event of any such relocation of Tenant, Landlord shall pay for Tenant's reasonable moving costs as well as the reasonable costs of replacing Tenant's stationery, business cards and the like, and the reasonable costs of relocating Tenant's wiring, cabling and telecommunications equipment; provided, however, Tenant shall not be entitled to any compensation for damages for any interference with or interruption of its business during or resulting from such relocation. If such option is validly so exercised by Landlord, Tenant shall continue to occupy the present Premises (upon all of the terms, covenants, conditions, provisions and agreements of this Lease, including

25

the covenant for the payment of base rent and additional rentals) until the date on which Landlord shall have substantially completed said alteration work in the New Premises. Tenant shall move from the present Premises into the New Premises immediately upon the date of such substantial completion by Landlord and shall vacate and surrender possession to Landlord of the present Premises on such date and if Tenant continues to occupy the present Premises after such date, then thereafter, during the period of such occupancy, Tenant shall pay base rent and additional rentals for the present Premises, in addition to the base rent and additional rentals for the New Premises. With respect to said alteration work in the New Premises, if Tenant requests materials or installations other than those originally installed by Landlord, or if Tenant shall make changes in the work (such non-original materials or installations for changes being subject to Landlord's written approval), and if such non-original materials or installments or changes shall delay the work to be performed by Landlord, or if Tenant shall otherwise delay the substantial completion of Landlord's work, the happening of such delays shall in no event postpone the date for the commencement of the payment of base rent and additional rentals for the New Premises, beyond the date on which such work would have been substantially completed but for such delay, and, in addition, Tenant shall continue to pay base rent and additional rentals for the original Premises until it vacates and surrenders same as aforesaid. Landlord at its discretion may substitute materials of like quality for the materials originally utilized.

24. <u>FORCE MAJEURE</u>. In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by a reason of cause or causes beyond Landlord's or Tenant's (as the case may be) control (whether foreseen or unforeseen), including, without limitation, strikes, lockouts, labor troubles, inability to procure materials or building permits, failure of power, restrictive government laws or regulations, riots, insurrection, war, inspection delays, pandemics, epidemics, endemics, public health emergencies, or other reason other than finance that is not within the reasonable control of Landlord or Tenant (as the case may be), whether or not related to the foregoing enumerated causes, and which is not the fault of the party delayed in performing work or doing acts required under the terms of this Lease, such party's sole and exclusive remedy under this Lease, at law and in equity shall be that the performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of the delay. The provisions of this Section shall not operate to extend, toll or otherwise postpone the Commencement Date hereunder and shall not cancel, postpone, or delay the due date of any payment to be made by Tenant hereunder, nor operate to excuse Tenant from prompt payment of any rent or other sums required by the terms of this Lease or from any other obligations hereunder that can be satisfied by the payment of money (e.g., maintenance of insurance), and Tenant further acknowledges and agrees that supervening events which render performance for Tenant unprofitable, less profitable or more difficult shall not excuse Tenant from the timely payment of rent or any other amount due under this Lease.

25. <u>RULES AND REGULATIONS.</u> Tenant shall comply with the rules and regulations of the Building attached hereto as <u>Exhibit D</u> and incorporated herein by this reference, and such other reasonable rules and regulations (or modifications thereto) adopted by Landlord from time to time. In the event of any modifications or amendments to such rules and regulations, Tenant shall be notified of such modifications or amendments at least thirty (30) days (or such shorter period of time in the event of an emergency, public health crisis or other situation which reasonably requires lesser notice) prior to the enforcement of such rules and regulations against Tenant. Tenant shall

also cause its agents, contractors, subcontractors, employees, customers, and subtenants to comply with all rules and regulations.

26.    **EXCULPATION OF LANDLORD. LANDLORD'S OBLIGATIONS AND LIABILITY TO TENANT WITH RESPECT TO THIS LEASE SHALL BE LIMITED SOLELY TO LANDLORD'S INTEREST IN THE BUILDING, AND NEITHER LANDLORD NOR ANY JOINT VENTURES (IF ANY), MEMBERS, PARTNERS, OFFICERS, DIRECTORS, EMPLOYEES OR SHAREHOLDERS OF OR IN LANDLORD SHALL HAVE ANY PERSONAL LIABILITY WHATSOEVER WITH RESPECT TO THIS LEASE, AND TENANT HEREBY EXPRESSLY WAIVES AND RELEASES SUCH PERSONAL LIABILITY ON BEHALF OF ITSELF AND ALL PERSONS CLAIMING BY, THROUGH OR UNDER TENANT. TENANT AGREES THAT TENANT SHALL LOOK SOLELY TO LANDLORD'S INTEREST IN THE BUILDING OF WHICH THE PREMISES ARE A PART FOR THE SATISFACTION OF ANY CLAIM, JUDGMENT OR DECREE REQUIRING THE PAYMENT OF MONEY BY LANDLORD BASED ON ANY DEFAULT HEREUNDER, AND NO OTHER PROPERTY OR ASSETS OF LANDLORD, ITS AFFILIATES, SUCCESSORS, MEMBERS, PARTNERS, SHAREHOLDERS, SUBSIDIARIES, OR ASSIGNS, SHALL BE SUBJECT TO LEVY, EXECUTION OR OTHER ENFORCEMENT PROCEDURES FOR THE SATISFACTION OF ANY SUCH CLAIM, JUDGMENT, INJUNCTION OR DECREE.**

THE PARTIES HERETO affix their signatures effective as of the day and year first written above.

PLEASE READ THIS LEASE CAREFULLY. NEITHER LANDLORD, ITS AGENTS OR EMPLOYEES, ARE AUTHORIZED TO GIVE LEGAL, TAX, OR ACCOUNTING ADVICE. IF YOU DESIRE SUCH ADVICE, CONSULT YOUR ATTORNEY AND/OR ACCOUNTANT BEFORE SIGNING.

**LANDLORD**:

**SUN COURT PARTNERS, LP**, a Florida limited partnership

By:    **SUN COURT GP, INC.**, a Florida corporation, Its General Partner

By:_____
        Andrew Webb, President

[SIGNATURES CONTINUED ON NEXT PAGE]

27

28

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

**TENANT**:

**ATLANTA LIGHT BULBS, INC.,**
a Georgia corporation

By: _Jessica Mendoza_
Name: _Jessica Mendoza_
Title: _CEO_

## EXHIBIT A

Floor Plan

Suite 460– 7,685 Square Feet (subject to change)



(Sketches, cross-hatching, dimensions and area calculations are for illustrative purposes only and are not intended to detail the actual physical boundaries, dimensions or square footage of the Premises.)

**EXHIBIT B**

**WORKLETTER**

Tenant accepts the Premises in its "AS IS, WHERE IS" condition, "WITH ALL FAULTS" and without any representations or warranties (express or implied) whatsoever, and Landlord shall have no obligation to perform any work with respect to the Premises or to provide any allowances with respect thereto, except as otherwise hereinafter expressly provided in this Exhibit B. This Exhibit B governs Landlord's and Tenant's respective obligations with respect to construction of those leasehold improvements which Tenant desires to make to the Premises (the "**Tenant Improvements**"). Landlord shall deliver the Premises to Tenant in its "AS-IS, WHERE-IS" condition promptly following the date of this Lease (the actual date of such delivery being the "Delivery Date") for the sole purpose of Tenant commencing construction of the Tenant Improvements (as defined below).

PART I.        **INTENTIONALLY OMITTED**

PART II.       **LANDLORD AND TENANT PRE-CONSTRUCTION OBLIGATIONS**

1.      Tenant will deliver to Landlord a detailed space plan containing the relevant information and written instructions relating thereto which are required to prepare the Tenant Working Drawings (defined below) for the Tenant Improvements (said space plan and other information and instructions being called the "**Tenant Space Plan**").

2.      Landlord will review the Tenant Space Plan and report any issues to Tenant within five (5) business days after Landlord's receipt thereof.

3.      Tenant shall cause working drawings (the "**Tenant Working Drawings**") of the Tenant Improvements shown on the Tenant Space Plan to be prepared and delivered to Landlord.  The Tenant Working Drawings shall consist of the complete sets of plans and specifications in the form of working drawings or construction drawings identifying Tenant's interior layout of the Premises, including complete sets of detailed architectural, structural, mechanical, electrical, and plumbing working drawings for any and all Tenant Improvements.  The Tenant Working Drawings shall include such written instructions or specifications as may be necessary or required to secure a building permit from the city and/or county in which the Building is located for the Tenant Improvements to commence in due course.  The Tenant Working Drawings shall be prepared by architects and engineers selected by Tenant and approved by Landlord.

4.      Landlord shall have five (5) business days to review any submittal or re-submittal of the Tenant Working Drawings and notify Tenant whether Landlord approves the same (which approval shall not be unreasonably withheld or delayed) or the reasons Landlord does not approve them. Tenant shall have five (5) business days to correct any matter on the Tenant Working Drawings which Landlord does not approve and to resubmit the revised Tenant Working Drawings to Landlord.

5.      Upon receipt of the final, mutually approved Tenant Working Drawings, Tenant agrees to submit for pricing by its contractors and subcontractors (which are to be selected by Tenant with

31

Landlord's approval) the Tenant Improvements (any such contractor selected to supervise the construction of the Tenant Improvements is hereinafter called the **"General Contractor"**). Tenant shall then enter into a Construction Contract with the General Contractor in form acceptable to Landlord and Tenant. EXCEPT AS EXPRESSLY SET FORTH IN THIS EXHIBIT B, LANDLORD SHALL NOT BE OBLIGATED TO, AND DOES NOT, MAKE ANY WARRANTIES, EXPRESS OR IMPLIED WITH RESPECT TO THE TENANT IMPROVEMENTS WORK NOR SHALL LANDLORD BE OBLIGATED FOR ANY OF THE WARRANTIES FROM TENANT'S ARCHITECT OR THE GENERAL CONTRACTOR TO TENANT. ALL IMPLIED WARRANTIES WITH RESPECT THERETO, INCLUDING BUT NOT LIMITED TO THOSE OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE EXPRESSLY NEGATED AND WAIVED.

6.      After receipt of the Construction Contract between Tenant and the General Contractor, Tenant shall arrange for the completion of the Tenant Improvements and, in the event that Tenant requests to have the Landlord's Property Manager act as the construction manager for the Improvements, Landlord will coordinate the preparation of the Premises by the General Contractor in accordance with Exhibit B-1; provided, however, Landlord shall not be required to permit the installation of any improvements which are not in conformity with the plans and specifications for the Project or which are not approved by Landlord or Landlord's architect.

7.      Tenant shall pay and be responsible for the architectural and engineering fees incurred in preparing the Tenant Space Plan and the Tenant Working Drawings or otherwise relating to the making of all of the Tenant Improvements to the extent arising from or after the Effective Date of this Lease, all subject to application of the Improvement Allowance (as defined below).

8.      Tenant shall be solely responsible for the compliance of the Tenant Space Plan, the Tenant Working Drawings and all of the Tenant Improvements with applicable legal requirements and building rules and regulations. Tenant shall be responsible for applying for and obtaining all permits required for Tenant to perform the Tenant Improvements or to operate within the Premises, including, without limitation, the final certificate of occupancy or its equivalent, and for obtaining the final fire inspection approval after installation of its fixtures, furniture and equipment.

### PART III.     CERTAIN PROVISIONS RELATING TO THE TENANT IMPROVEMENTS

1.      Upon execution of the Construction Contract between Tenant and the General Contractor, Tenant agrees to use diligence to cause the General Contractor to complete the installation of the Tenant Improvements on or before the estimated finish date shown therein. Tenant shall pay all costs incurred in connection with the Tenant Improvements work including the costs of the materials and labor therefor and associated architectural and engineering fees.

2.      The Construction Contract between Tenant and the General Contractor shall contain an estimate of the date the Tenant Improvements will be Substantially Complete. **"Substantially Complete"** means the date on which (i) a certificate of occupancy has been issued for the Premises, if required, and (ii) the Tenant Improvements have been substantially completed in accordance with the Tenant Working Drawings, with a punch-list of uncompleted items which do not interfere in any material respect with the use or enjoyment of the Premises.

32

3.      Tenant may make changes in the Tenant Improvements with the prior approval of Landlord and as otherwise provided for in the Construction Contract between Tenant and the General Contractor.  Any change which Tenant desires to make in the Tenant Improvements shall be described in a written change order that shall be submitted for Landlord's approval, which approval shall not be unreasonably withheld or delayed.

4.      If for any reason the Premises are not ready for occupancy by the estimated finish date stated in the Construction Contract between Tenant and the General Contractor, Landlord shall not be liable or responsible for any claims, damages or liabilities in connection therewith or by reason thereof.

5.      Melanie Lehman is hereby designated the individual who Landlord agrees shall be available to meet and consult with Tenant as Landlord's representative respecting the matters which are the subject of this Exhibit, and who, as between Landlord and Tenant, shall have the power to legally bind Landlord (**"Landlord's Designated Representative"**).  Jordan Barnett is hereby designated as the individual who Tenant agrees shall be available to meet and consult with Landlord as Tenant's representative respecting the matters which are subject to this Exhibit, and who, as between Tenant and Landlord, shall have the power to legally bind Tenant (**"Tenant's Designated Representative"**).  Landlord and Tenant shall each have the right to change their respective representatives, and such representatives' responsibilities, upon notice to the other party given pursuant to the terms of the Lease.  All inquiries or instructions from Tenant's Designated Representative or Tenant's architect pertaining to the Tenant Improvements shall be directed in writing to the Landlord's Designated Representative.

6.      Tenant, together with Tenant's contractors and agents, who desire to visit the Premises or the Project during the prosecution of the Tenant Improvements shall obtain the prior written consent of Landlord's Designated Representative; provided, however, that Tenant's architect and Tenant's Designated Representative shall have the right to make visits to inspect the Premises so long as they comply with reasonable rules and regulations of Landlord.

7.      Landlord's Designated Representative shall at all times have access to and the right to inspect the Tenant Improvements.

8.      Landlord's Designated Representative shall have authority to reject any of the Tenant Improvements which do not conform to the Contract Documents as defined in the Construction Contract between Tenant and the General Contractor.

### PART IV.      GENERAL CONTRACTOR

1.      The General Contractor and all other contractors and subcontractors shall: (i) conduct its work in such a manner so as not to unreasonably interfere with any other construction occurring on or in the Project or the Premises; (ii) comply with all rules and regulations relating to the construction activities in or on the Project, as may be reasonably promulgated from time to time by Landlord, and (iii) maintain such insurance and bonds in force and effect as may be reasonably requested by Landlord or as required by applicable law.  As a condition precedent to Landlord's approving the General Contractor, Tenant and the General Contractor shall deliver to Landlord

such assurances or instruments to evidence the General Contractor's compliance or agreement to comply with the provisions of this paragraph as may be reasonably requested by Landlord.

2.      Tenant shall indemnify, defend (with counsel acceptable to Landlord) and hold Landlord, harmless from and against any and all losses, damages, costs (including costs of suit and attorneys' fees), liabilities, or causes of action arising out of or relating to the work of the General Contractor and all other contractors and subcontractors, including but not limited to mechanics', material supplier's or other liens or claims (and all costs or expenses associated therewith) asserted, filed or arising out of any such work.  All material suppliers, contractors, artisans, mechanics, laborers and other parties hereafter contracting with Tenant or any of Tenant's contractors or subcontractors for the furnishing of any labor, services, materials, supplies or equipment with respect to any portion of the Premises are hereby charged with notice that they must look solely to Tenant for payment for same.  Without limiting the generality of the foregoing, Tenant shall repair or cause to be repaired at its expense all damage caused by the General Contractor, its subcontractors or their employees.

        PART V.        **CONSTRUCTION COORDINATION FEE**

In the event that Tenant, in its sole discretion, requests to have the Landlord's Property Manager act as the construction manager for the Improvements, then in such event, Tenant shall pay Landlord a construction coordination fee equal to four percent (4%) of the actual construction costs for the Tenant Improvements, which fee shall be paid to Landlord at the same time that Landlord pays Tenant the Improvement Allowance as provided in Part VII of this Exhibit B.

        PART VI.        **INTENTIONALLY OMITTED**

        PART VII.        **TENANT INDUCEMENT**

1.      To help defray the costs of the Tenant Improvements, Landlord agrees to make available to Tenant an allowance in an amount up to, but not to exceed, $45.00 times the rentable area of the Premises (the **"Improvement Allowance"**).  The Improvement Allowance shall be payable on account of costs incurred in designing and constructing the Tenant Improvements.   For so long as Tenant is not in default under this Lease, Landlord shall pay the Improvement Allowance on a monthly basis all in accordance with customary construction disbursement procedures and documentation as required by title insurance companies and institutional construction lenders (including, without limitation, architect's certificates, lien waivers and copies of invoices). Landlord shall be permitted to offset against the Improvement Allowance any amounts past due to Landlord by Tenant under this Lease.  If the actual costs of the Tenant Improvements exceed the amount of the Improvement Allowance, Tenant shall pay the excess costs without reimbursement from Landlord as and when such excess costs become due and payable.  Landlord's obligation to make the Improvement Allowance (including the Excess Allowance) available to Tenant shall expire with respect to any portion of the Improvement Allowance (including the Excess Allowance) that is not used by Tenant on or before December 31, 2021.

2.      If the entire Improvement Allowance is not exhausted in constructing the Tenant Improvements, then, subject to the terms and provisions of this Paragraph, such unused and remaining portion (the **"Excess Allowance"**) may be used by Tenant (i) to reimburse Tenant for

reasonable costs actually incurred by Tenant with respect to (a) moving to the Premises or (b) the acquisition and installation of telecommunications equipment, furniture, kitchen/breakroom appliances, and cabling specifically for the Premises (collectively, the "**Reimbursement**") and/or (ii) as a credit against successive installments of base rent coming due and payable under this Lease until exhausted (the "**Credit**").  If Tenant elects to use any portion of the Excess Allowance as a Credit, then Tenant shall designate the amount of such Excess Allowance, if any, to be applied as a credit against base rent by written notice to Landlord delivered prior to July 31, 2021. Notwithstanding anything in this Lease to the contrary, if Tenant does not designate the amount of such Excess Allowance, if any, to be applied as a credit against base rent prior to July 31, 2021, Tenant shall have no further right to apply the Excess Allowance, if any, as a Credit.  If Tenant elects to use any portion of the Excess Allowance as a Reimbursement, the Excess Allowance, if any, shall be disbursed to Tenant within thirty (30) days after Tenant's request for same (but, in any event, any such request may not be delivered until after the Commencement Date), together with original invoices or certified copies thereof and lien waivers (if applicable) for such costs.

**PART VIII    TIME OF THE ESSENCE**

It is stipulated that time is of the essence in connection with Tenant's compliance with the terms of this Exhibit B.

EXHIBIT B-1

**LANDLORD COORDINATION DUTIES**

1.      Landlord will assign a construction coordinator from Landlord's project staff to assist Tenant and its representatives in executing the Tenant Improvement work.

The construction coordinator shall act for the duration of the Tenant Improvement work (which shall end thirty (30) days after Tenant first takes occupancy of any part of the Leased Premises), provided that if Landlord reassigns or otherwise terminates such construction coordinator, the replacement construction coordinator must have similar qualifications and must be approved by Tenant, which approval shall not be unreasonably withheld.

When the Tenant Working Drawings have been approved, Landlord will, if requested by Tenant, assist Tenant with the bidding process.

Landlord, together with the Tenant's representative, will serve as a communication resource between the Tenant's consultants, the General Contractor, and the Base Building team. All efforts will be directed toward causing the Tenant Improvement work to be completed on schedule with the highest quality and at least cost possible to the Tenant.

Landlord shall review and provide appropriate responses to the construction schedule provided by the Tenant's construction manager and contractor.

Causing the General Contractor's obligations to be met and coordinated relative to the Tenant Improvement work, including completion of Base Building work, stocking of materials for installation during Tenant Improvement work, etc.

Attend periodic coordination meetings convened by Tenant and/or its representatives.

Assist in developing the monitoring and coordination procedures for submittals, requests for change, change orders, etc., between all parties, relative to the Base Building changes requested by Tenant.

Conduct regular observations of the work, including architectural, mechanical, and electrical installations, with in-house staff. Prepare reports to the Tenant's construction manager suggesting necessary corrective measures.

Coordinate the Tenant's use of Base Building consultants as needed relative to the Tenant Improvement work.

Assist the Tenant's consultant in timely acquisition of building permits, certificates of occupancy, or other approvals necessary for the execution of Tenant Improvement work.

Assist the Tenant during move-in, particularly with regard to coordination of dock facilities, elevators, etc., at the site.

## EXHIBIT C

Declaration of Commencement Date

This Declaration is made as of _____, 20__, by and between SUN COURT PARTNERS, LP, a Florida limited partnership ("Landlord"), and ATLANTA LIGHT BULBS, INC., a Georgia corporation ("Tenant").

Landlord and Tenant are parties to that certain Office Lease (the "Lease") dated as of _____, 2020.

In accordance with the Lease, Landlord and Tenant hereby memorialize that:

1.    The Commencement Date is January 1, 2021.

2.    The expiration date of the Term is July 31, 2028.

3.    The rentable area of the Premises is _____ square feet, and Tenant's Proportionate Share is _____%.

IN WITNESS WHEREOF, the parties hereto have executed this Declaration as of the date first above written.

TENANT:

ATLANTA LIGHT BULBS, INC.,
a Georgia corporation

By:    _Jessica Mendoza_
Name:    _Jessica Mendoza_
Title:    _CEO_

LANDLORD:

SUN COURT PARTNERS, LP, a Florida limited partnership

By:    SUN COURT GP, INC., a Florida
       corporation, Its General Partner

       By:_____
              Andrew Webb, President

## EXHIBIT D

Rules and Regulations

1.     Smoking is prohibited in the Premises, the main lobby, public corridors, elevators and elevator lobbies, stairwells, restrooms, and other common areas within the Building.

2.     The sidewalks, passages, exits and entrances shall not be obstructed by Tenant or used by Tenant for any purpose other than for ingress to and egress from the Premises.

3.     The toilet rooms, urinals, wash bowls and other apparatus shall not be used for any purpose other than for which they were constructed and no foreign substance of any kind whatsoever shall be thrown therein and to the extent caused by Tenant or its employees or invitees, the expenses of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by Tenant.

4.     Upon the termination of the tenancy, Tenant shall deliver to Landlord all keys or electronic key cards and passes for the Premises.  In the event of loss of any keys or electronic key cards furnished by Landlord, Tenant shall pay Landlord therefor.  Tenant shall not make or cause to be made any such keys or electronic key cards and shall order all such keys or electronic key cards solely from Landlord for any additional such keys or electronic key cards over and above the keys or electronic key cards furnished by Landlord at occupancy.

5.     Without the prior written consent of Landlord, no assignee, subtenant or successor in interest of Tenant shall use the name of the Building, the Project or any picture of the Project or Building in connection with or in promoting or advertising the business of Tenant except Tenant may use the address of the Building as the address of its business.

6.     Tenant shall allow no animals or pets to be brought to or remain in the Premises or any part thereof, without the prior written consent of Landlord.

7.     Tenant agrees that it and its employees will cooperate fully with Project employees in the implementation of any security procedures for the Project.

8.     Landlord reserves the right to exclude or expel from the Project or Building any person who, in the judgment of Landlord is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of any of the rules and regulations of the Project or Building.

9.     No vending machines of any description shall be installed, maintained or operated in a place on the Premises visible from outside the Premises, without the written consent of Landlord.

10.    Tenant shall not:

(i)    place any radio or television antennae on the roof or on any part or the outside of the Premises or elsewhere on the Project without Landlord's prior written consent;

(ii)    operate or permit to operate any musical or sound producing instrument or device inside or outside the Premises which may be exceedingly loud from outside the Premises. Exceedingly loud shall mean noise that exceeds any local codes or ordinances or is disruptive to other businesses or tenants in the Building;

(iii)    use any illumination or power for the operation of any equipment or device other than electricity; or

(iv)    operate any electrical device from which may emanate electrical waves which may interfere with or impair radio or television broadcasting or reception from or in the Project or Building.

10.    Tenant and its employees shall and shall cause its invitees and licensees to park only in areas which are clearly marked for parking.

11.    No firearms are permitted in the Building or elsewhere on the Project, except firearms carried by licensed Federal, State of Georgia or local personnel while on duty.

12.    Landlord reserves the following rights, exercisable without notice and without liability to Tenant for damage or injury to property, person or business and without effecting an eviction, constructive or actual or disturbance of Tenant's use of possession or giving rise to any claim for set-off or abatement of rent:

(i)    To change the Project's or Building's name or street address;

(ii)    To install, affix and maintain any and all signs on the exterior and interior of the Project or Building;

(iii)    To retain at all times, and to use in appropriate instances, keys to all doors within and into the Premises. No locks or bolts shall be altered, changed or added without the prior written consent of Landlord;

(iv)    To decorate or to make repairs, alterations, additions or improvements, whether structural or otherwise, in and about the Premises, Building and Project, or any part thereof, and for such purpose to enter upon the Premises, and during the continuance of said work to temporarily close doors, entryways and public spaces in the Project and Building and to interrupt or temporarily suspend Project or Building services and facilities;

(v)    To prescribe the location and style of the suite number and identification sign or lettering of the Premises occupied by Tenant;

(vi)    To control and prevent access to common areas and other non-general public areas; and

(vii)    From time to time to make and adopt such reasonable rules and regulations, in addition to or other than or by way of amendment or modification of the rules and regulations contained herein or other sections of this Lease, for the protection and welfare of the Project and its tenants and occupants, as the Landlord may determine, and the Tenant agrees to abide by all such rules and regulations.

## EXHIBIT E

Special Stipulations

Special Stipulations to Lease Agreement ("Lease") between SUN COURT PARTNERS, LP, a Florida limited partnership, as Landlord, and, ATLANTA LIGHT BULBS, INC., a Georgia corporation, as Tenant, for Suite 460, at Two Sun Court, Norcross, Georgia 30092, containing approximately 7,685 rentable square feet.

      1.    Right of First Refusal. Subject to the existing rights of tenants in the Building as of the date hereof and so long as Tenant is then in occupancy of the entirety of the Premises, Landlord grants to Tenant the right (the "**First Refusal Right**") to lease the First Refusal Space, as hereinafter defined, at any time on or before July 31, 2026 (the "**First Refusal Right Expiration Date**"), on and subject to the following terms and conditions:

      (a)    The First Refusal Right is not effective or exercisable by Tenant during the existence of a default by Tenant under this Lease beyond any applicable notice and cure period.

      (b)    The "**First Refusal Space**" shall mean any space contiguous to the Premises (as of the date hereof) on the fourth (4th) floor of the Building that is the subject of a Third Party Offer, as defined below.

      (c)    Should Landlord receive from a prospective third party tenant an offer to lease the First Refusal Space or any premises within the Building containing all or a portion of the First Refusal Space that Landlord is willing to accept or should Landlord give a prospective tenant an offer to lease the First Refusal Space or any premises within the Building containing all or a portion of the First Refusal Space, which offer Landlord anticipates the prospective tenant will accept (the "**Third Party Offer**"), Landlord agrees promptly to so notify Tenant in writing of the relevant economic terms of the Third Party Offer. If the Third Party Offer contains space in addition to the First Refusal Space, if Tenant accepts the Third Party Offer, it shall be required to lease all of the space that is the subject of the Third Party Offer (the "**Offer Space**"). Tenant shall have a period of five (5) business days after its receipt (or deemed receipt) of the notice to Tenant within which to exercise the First Refusal Right (the "**Acceptance Period**") by delivery to Landlord of written notice of its exercise on or before the last day of the Acceptance Period. If Tenant fails to duly and timely exercise the First Refusal Right, or elects not to exercise the First Refusal Right, the same shall lapse, and be of no further force or effect, and Landlord shall be free to lease the First Refusal Space, subject to subparagraph (f) below.

      (d)    Within ten (10) business days after the effective date of Tenant's exercise of the First Refusal Right, Landlord and Tenant shall enter into an amendment to this Lease adding the Offer Space to the Premises, which amendment shall subject the Offer Space to the terms and provisions of this Lease except that all of the economic terms of the Third Party Offer, including the base rent, lease term, Base Year, rent abatement, and any improvement allowance relating to the Offer Space, shall be as set forth in the Third Party Offer. The term with respect to such Offer Space shall not be coterminous with this Lease, but shall be for the length of term provided in the Third Party Offer.

41

(e)      Tenant shall accept the Offer Space in either its existing "as is" condition or as provided in the Third Party Offer (including any improvement allowance provided for therein). Tenant's improvements to the Offer Space shall be designed and installed in accordance with the parties' agreement at the time this First Refusal Right is exercised.

(f)      If Tenant fails to or elects not to exercise the First Refusal Right and the third party submitting the Third Party Offer does not lease the Offer Space, the applicable portion of the Offer Space that is First Refusal Space shall again become subject to the First Refusal Right herein contained as to any subsequent Third Party Offer submitted to Landlord on or prior to the First Refusal Expiration Date. Once all or any portion of the First Refusal Space has been leased by Tenant or a third party, Tenant's First Refusal Right shall no longer apply to such leased space and shall be subordinate to the rights granted on any remaining First Refusal Space (if any), if such remaining space is encumbered as part of such Third Party Offer.

(g)      Tenant's rights under this **Special Stipulation No. 1** are and shall be subject and subordinate to the rights and options of tenants under other leases of portions of the Building and their successors or assigns, as such rights and options exist on the date hereof. Accordingly, Landlord shall not be obligated to give Tenant notice respecting a Third Party Offer prior to or in conjunction with the exercise of any such rights or options. Furthermore, Landlord shall have the right to enter into a lease of all or a portion of the First Refusal Space with a tenant or subtenant other than Tenant occupying such space on the date such space would otherwise become available for lease without this First Refusal Right being triggered and therefore without Landlord first being required to submit a notice respecting a Third Party Offer to Tenant, and such lease with any such occupant shall be superior to, but shall not have the effect of terminating, Tenant's rights under this **Special Stipulation No. 1**. Tenant acknowledges that Landlord may make simultaneous offers to lease any portion of the First Refusal Space to Tenant and to any tenant holding such superior rights, and thus if the tenant holding such superior rights elects to accept such offer from Landlord, Landlord will not be bound by its offer to Tenant.  Further, Landlord may enter into short term or temporary (i.e., not to exceed 1 year) leases or license agreements with new, prospective, or existing tenants for all or any portion of the First Refusal Space while such prospective or new tenant's lease is being negotiated or permanent space is being constructed, or while such existing tenant's space is being remodeled or reconstructed, without triggering this First Refusal Right and without being obligated to give Tenant a notice in connection therewith.

(h)      The right granted to Tenant under this **Special Stipulation No. 1** is personal to the named Tenant, and in the event of any assignment of this Lease or sublease by Tenant, this First Refusal Right to lease the First Refusal Space shall thenceforth be void and of no further force or effect.

(i)      This First Refusal Right will expire on the First Refusal Right Expiration Date.

2.      <u>Existing Furniture</u>.  As an additional inducement to Tenant to enter into this Lease, Landlord hereby agrees to convey to Tenant any of its right, title and interest in and to certain furniture which is currently located in the Premises (as further specified below, the "<u>Furniture</u>"), and to evidence such conveyance Landlord shall deliver to Tenant, on or prior to the

42

Commencement Date, an executed quitclaim bill of sale in the form set forth in <u>Exhibit G</u> attached hereto (the "<u>Quitclaim Bill of Sale</u>").  TENANT HEREBY AGREES THAT IT WILL ACCEPT THE FURNITURE IN ITS "AS IS" CONDITION, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND FROM LANDLORD, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO OWNERSHIP, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. As of the Commencement Date, the Furniture shall be owned by Tenant and, therefore, Tenant shall be responsible for maintaining, repairing and replacing same, paying personal property taxes on same, and removing same from the Premises on or before the expiration or earlier termination of this Lease. Notwithstanding anything in this **Special Stipulation No. 2** to the contrary, Landlord and Tenant shall agree in writing upon the definitive list of Furniture to be conveyed to Tenant pursuant to the Quitclaim Bill of Sale prior to the commencement of construction of the Tenant Improvements, which list of Furniture shall be documented by the parties in writing. In addition, Landlord hereby agrees to remove any furniture which is currently located in the Premises that is not designated as the Furniture promptly following the parties' definitive agreement on the list of Furniture to be conveyed to Tenant.

43

## **EXHIBIT F**

Assignment Limitations

1.      Governmental or quasi-governmental entity

2.      Childcare facility

3.      Health care, dental or personal counseling office

4.      Retail travel agency

5.      Entity primarily engaged in political or lobbying activities

6.      Entity engaged in commerce in "X rated" media

7.      Broadcasting studios (TV, radio, etc.)

8.      Retail sale or rental of products or materials

9.      Employment agency

10.     Beauty services

11.     Schools or other training or educational operations

12.     Operation primarily engaged in clerical support, data processing or messenger services

Nothing in this Exhibit shall prohibit an assignment of this Lease for use as the regional, executive, corporate or headquarters office or offices of businesses engaged in the activities described in 2, 3, 4, 7, 8, 9, 10, 11 and 12 above so long as in such regional, executive, corporate or headquarters office in the Premises the assignee does not conduct the operation or activity or type of facility described in the list above.

44

**EXHIBIT G**

**QUITCLAIM BILL OF SALE**

This QUITCLAIM BILL OF SALE is given this ___ day of ____, 202__ by SUN COURT PARTNERS, LP, a Florida limited partnership ("Seller"), to ATLANTA LIGHT BULBS, INC., a Georgia corporation ("Buyer").

Seller, for Ten and No/100 Dollars ($10.00) and other good and valuable consideration received from Buyer, the receipt and sufficiency of which are hereby acknowledged, hereby bargains, sells and conveys to Buyer any of its right, title and interest in and to all furnishings, furniture, equipment, supplies, and other personal property listed on Schedule 1 hereto (hereinafter collectively referred to as "Personal Property"), to have and to hold the Personal Property unto Buyer, its successors and assigns, forever. THE PERSONAL PROPERTY IS BEING TRANSFERRED BY SELLER TO BUYER IN ITS "AS IS, WHERE IS" CONDITION, WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY KIND FROM SELLER, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO OWNERSHIP, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

IN WITNESS WHEREOF, Seller has hereunto executed this Quitclaim Bill of Sale as of the date first above written.

SELLER:

**SUN COURT PARTNERS, LP**, a Florida limited partnership

By:     **SUN COURT GP, INC.**, a Florida corporation, Its General Partner

By: _____
            Andrew Webb, President

45

## SCHEDULE 1 TO QUITCLAIM BILL OF SALE

[to be inserted]